**In re LANDMARK DISTRIBUTORS, INC., Alleged Debtor.**

**Bankruptcy No. 94–20456.**

United States Bankruptcy Court, D. New Jersey.

Nov. 16, 1995.

Kaye, Scholer, Fierman, Hays & Handle by Herbert S. Edelman, Jane W. Parver, Jay G. Strum, Michael Lynn, New York City, Frankel and Abrams by Sandor Frankel, New York City, for Alleged Debtor Landmark Distributors, Inc.

DeMaria, Ellis, Hunt, Salsberg & Friedman by William J. Hunt, Lee H. Udelsman, Paul Friedman, Joseph D. Olivieri, Newark, NJ, for Tommy Boy Music, Inc.

Paul, Hastings, Janofsky & Walker by George L. Graff, James W. Kennedy, New York City, for Tommy Boy Music, Inc., Select Records and Luke Records.

Winick & Rich by Jeffrey N. Rich, Robert N. Michaelson, New York City, for Max Entertainment, Inc.

Davis, Scott, Weber & Edwards by David Dunn, Jay Gerber, New York City, for Various Non–Party Warner Entities.

Reid & Priest by Richard P. Swanson, New York City, for Cory Robbins.

## OPINION

WILLIAM F. TUOHEY, Bankruptcy Judge.

The within matter comes before the court pursuant to 11 United States Code Section 303(i) wherein alleged debtor Landmark Distributors, Inc. ("Landmark") seeks to have the court grant judgment awarding Landmark costs and reasonable attorneys fees; in addition, Landmark seeks damages proximately caused by the filing of an involuntary bankruptcy proceeding, as well as punitive damages. Issues under Bankruptcy Code Section 303 going to the awarding of damages in the context of a dismissed involuntary proceeding are core matters as defined by the federal Congress in 28 United States Code Section 157.

### PROCEDURAL HISTORY

On January 25, 1994, three creditors filed an involuntary bankruptcy petition against Landmark Distributors, Inc. ("Landmark"). Landmark filed an answer to the involuntary complaint and issue was joined.

For four days, commencing March 15, 1994, the bankruptcy court tried the issue of the filing of the involuntary complaint and whether the alleged debtor, Landmark, should be placed in a chapter 7 bankruptcy proceeding. At the conclusion of the four-day trial, the court issued an oral bench opinion on March 24, 1994, setting forth the court's findings. In summary, the court found that the involuntary petition should be dismissed. During the four-day trial, the court had the benefit of hearing the testimony of eight witnesses and reviewing exhibits placed in evidence. The parties have stipulated herein that the initial record of the proceedings in March of 1994 is incorporated into the matter *sub judice* on the trial of damages. The parties have further conceded that the oral opinion of this court rendered on March 24, 1994, and memorialized in a transcript filed April 5, 1994, are specific findings made by the trier of fact and also constitute the law of the case.

At the conclusion of the March 1994 trial, an appeal was duly taken to the district court. In a letter opinion of September 30, 1994, District Court Judge Nicholas Politan affirmed the findings of the bankruptcy court dismissing the involuntary petition against Landmark.

## FACTUAL FINDINGS FROM MARCH 1994 OPINION

On January 25, 1994, Landmark Distributors, Inc. was a corporation engaged in the distribution of records. Its business consisted of purchasing records from record manufacturing companies and, in turn, distributing those records to retail outlets throughout the United States.[1]

The three petitioning creditors who originally filed the bankruptcy matter on January 25, 1994, consisted of Max Entertainment Inc. ("Max"), who asserted a claim against the alleged debtor of $26,113. The second petitioning creditor was Select Records ("Select") who asserted a claim originally in the amount of $121,694; however, said claim was ultimately reduced in the context of the March 1994 trial to the sum of $106,000. Tommy Boy Music, Inc. ("Tommy Boy"), the third petitioning creditor,[2] asserted that it was owed a balance of $263,463 by Landmark Distributors, Inc.[3] All the petitioning creditors were in the record manufacturing business.

After listening to the testimony of eight witnesses at the original trial in March of 1994, the court found and ruled that there were extensive negotiations underway between Tommy Boy, one of the petitioning creditors, and Profile Records, a related entity to Landmark. The negotiations between Tommy Boy and Profile were aimed toward Tommy Boy acquiring the assets of Profile. The court expressly noted on page 7 of the March 24, 1994, transcript that the negotiations had commenced sometime in August of 1993, and that the negotiations took a more serious turn over the Labor Day weekend of September 1993.

At the conclusion of the first trial, the court noted that, with the exception of Landmark's agreement with Luke, each of the relationships between the petitioning creditors and Landmark was pursuant to an oral distribution agreement. The court also found that, although most of the petitioners' invoices specified that payment was due within 60 days, the industry had tolerated payments beyond the mere invoice date so long as normal monthly payments were being made.[4]

The court previously found that it was the nature of Landmark's business that it generally purchased records from manufacturers in the music industry. It is noted that Landmark's principal vendor was its related corporation known as Profile Records. The parties are also all in agreement that the primary area of the music industry serviced by Landmark was "niche music," catering to aficionados of rap music as well as dance music. In general, Landmark would purchase its records from the manufacturer.[5] After acquiring records, a distributor's task through sales personnel would be to sell the inventory or distribute same throughout the retail market place. Landmark has testified that it had a sales staff that would make calls on music chain stores as well as on small so-called "Mom-and-Pop" record outlets. Witnesses for both the petitioning creditors and the alleged debtor also agreed that it was a general policy in the record industry to allow a retail outlet to return unsold records to the distributor; the distributor, in turn, was customarily allowed to return recordings to the original manufacturer. There was a dispute at the original trial as to whether a distributor, such as Landmark, was entitled to auto-

1. Findings of the court in oral opinion of March 24, 1994: transcript, page 5, line 12.

2. After the initial group of three petitioning creditors referred to herein, a fourth creditor, Luke Records, on March 9, 1994, joined the original three petitioning creditors. The court notes that Luke Records has entered its own bankruptcy proceeding, and the damage trial which commenced June 7, 1995, has not involved Luke, nor is any claim being processed at this time by Landmark against Luke Records in view of the bankruptcy stay.

3. March 24, 1994, transcript, page 6, line 11.

4. March 24, 1994, transcript, page 34.

5. While the parties also are in agreement that record distributing companies such as Landmark often purchase records from the manufacturer for distribution, there are often, with specific record labels, different arrangements made for consignment sales, etc. However, for purposes of this opinion and an analysis of the issues in dispute, it is simpler to refer to the customary purchase of records by the distributor from the manufacturer.

matically return records to the manufacturer for credit or whether a distributor was required to wait for return authorization. However, the distinction is immaterial for purposes of this damage hearing.

The court, in its opinion at the conclusion of the initial trial, also expressly found that when a relationship between a record manufacturer and a distributor is terminated, the record manufacturer may appoint a new distributor to whom the retail sellers of the music may return their records. As a result of this rather elaborate process, the court expressly found that there is a customary and commercially reasonable six-month "reconciliation period" which follows the termination of a relationship between a distributor, such as Landmark, and a record manufacturing corporation. During the reconciliation period, the parties adjust the monies owed by the distributor to the manufacturer to take into consideration return records.

In analyzing the claims of the petitioning creditors at the conclusion of the first hearing, the court concluded that the Max claim was in litigation, which had been pending for some period of time in the State of New York, and that there was a legitimate dispute as to whether sums were owed by Landmark to Max. In connection with the Select claim, the court concluded that the termination by Select of its relationship with Landmark in December of 1993, triggered the commencement of a reconciliation period. Based on the commercially reasonable standard found by the court, the court concluded that Select's joining of the involuntary petition in January of 1994, one month after the termination of the relationship between Landmark and Select, was insufficient time for a reconciliation, and this allowed Landmark to say there was a dispute as to the amount owed and return credits to which Landmark was entitled.

Luke, the fourth petitioning creditor, having joined the proceeding after the filing of the original involuntary petition, had originally entered into a written distribution agreement with Landmark in July of 1992. The relationship between Luke and Landmark terminated in 1992 and resulted in

Landmark filing suit against Luke in the State of New York alleging breach of the distribution agreement. In the context of that litigation in the State of New York prior to the bankruptcy filing, Luke had filed a counterclaim alleging that approximately $195,661 was owed by Landmark to Luke. At the conclusion of the first hearing, the court found that there was a legitimate business dispute in litigation prior to bankruptcy between Luke and Landmark.

Tommy Boy Music, Inc., the largest of the original petitioning creditors, asserted a claim of $263,463 against Landmark. Landmark admitted owing Tommy Boy the asserted sum for records purchased during the distribution agreement between Tommy Boy and Landmark which ultimately was terminated in December of 1992. It is noted that in May of 1993, the parties agreed that the Landmark/Tommy Boy account was reconciled and the parties settled on an amount due. The amount of this sum was $493,000 as of May 1993.[6] The parties then agreed upon a repayment schedule which would allow Landmark to pay its obligation to Tommy Boy in installments. The agreement reflected that an $80,000 payment would be made in June 1993. It is not disputed that said payment was made. (Exhibit P–114.) Peter Takiff, chief financial officer for Tommy Boy, testified on March 16, 1994, that after the entry of the repayment agreement between Landmark and Tommy Boy, Landmark did pay the $80,000 initial payment required pursuant to the agreement between the parties and did make a total of $160,000 in payments as agreed. There did come a point in time in September of 1993, when substantial negotiations were underway between Tommy Boy and Landmark's related entity Profile, that Landmark stopped making its payments to Tommy Boy. However, Tommy Boy undertook no collection efforts and did not strenuously press for a payment until the Profile negotiations terminated in and around January 1994, just days before the filing of the involuntary bankruptcy.

In the original hearing Landmark took the position that both parties had agreed, in the

---

6. March 24, 1994, transcript, page 19.

negotiations to acquire Profile, that Landmark's payments to Tommy Boy could be voluntarily suspended pending an adjustment or offset at the ultimate projected closing between Tommy Boy and Profile. Tommy Boy disputes that it ever consented to a hiatus in the payments. However, at the first trial the court found that the parties did agree to a suspension of payments during the negotiations for the acquisition of Profile. This caused the bankruptcy court to hold, at the conclusion of the initial trial, that after the negotiations failed Tommy Boy was not entitled to demand an acceleration of the agreed upon payment plan and that Landmark's debt to Tommy Boy was therefore not in default at the time of the filing of the involuntary petition. In this context, it is also expressly noted that when the Profile negotiations collapsed and Tommy Boy pressed Landmark for immediate payment, Landmark responded with a $50,000 payment to Tommy Boy (exhibit D–21). Tommy Boy deposited Landmark's $50,000 check on January 14, 1994, eleven days before Tommy Boy filed the involuntary petition against Landmark.

### ADDITIONAL FACTUAL FINDINGS AT CONCLUSION OF 24 DAYS OF TRIAL COMMENCING JUNE 7, 1995, AND ENDING AUGUST 1, 1995. THESE FACTUAL FINDINGS ARE BASED UPON THE TESTIMONY OF THE 16 WITNESSES HEARD DURING THIS 24–DAY PERIOD, AS WELL AS UPON THE EXHIBITS PLACED IN EVIDENCE

All four of the petitioning creditors are engaged in the rap and dance music industry, as is Profile Records, Landmark Distributors' related record production company. Frederick Munao, the president of Select Records (one of the petitioning creditors), testified that Select was owned pursuant to a joint venture agreement with Atlantic Records. The parties are in agreement that Atlantic Records is part of the Time Warner

record family and that Tommy Boy is also part of the Time Warner record family.[7] Thus, of the petition debt of $395,576, two of the petitioning creditors were in the Time Warner family. Landmark, it was asserted, owed Select Records $106,000 and Tommy Boy Music $263,463. Thus, the Time Warner related debt was over 90% of the money asserted to be owed by Landmark in the involuntary petition before Luke joined.

Fred Munao of Select Records testified that he had been a long-standing friend of Thomas Silverman, the chief executive officer at Tommy Boy. Mr. Munao further testified (T. 72[8]) that as early as December 1993, he had one or two conversations with Mr. Silverman about Tommy Boy acquiring Profile. Mr. Munao also testified that he was familiar with the man who was running Profile Records: a gentleman by the name of Cory Robbins. Profile Records was owned by two gentlemen: Steven Plotnicki and Cory Robbins. Landmark Distributors was owned by the same two gentlemen with a small minority of the stock held by a third party. The testimony reflected that, in general, Mr. Robbins ran the Profile record manufacturing operation and Mr. Plotnicki supervised and oversaw the Landmark distribution operation.

Mr. Munao in his testimony stated that he had a luncheon engagement with Mr. Silverman in early January of 1994, and at this luncheon engagement he advised Mr. Silverman that he had terminated Landmark as a distributor. However, no discussion was held at this conference about the possibility of a bankruptcy filing. Mr. Munao testified that a few days after the luncheon conference with Mr. Silverman he received a telephone call inquiring if he would participate in the filing of an involuntary bankruptcy against Landmark. He stated that, after giving it some thought and consulting with some third parties, he agreed to participate. He further testified that he signed the involuntary bankruptcy petition (D–113) on or about January

---

7. Time Warner is a very substantial corporation, as is reflected by Tommy Boy's exhibit showing a portion of Time Warner's entertainment industry holdings which include print, film, television, and music media ventures (P–536).

8. References are to the trial transcripts which cover 24 days of trial from June 7, 1995, to August 1, 1995, consecutively numbered pages 1 through 4744.

14, 1994. Mr. Munao was told that Tommy Boy would pay the cost of the bankruptcy proceedings (T. 124).

Mr. Munao testified that the accounting and business records for his record company Select were processed and maintained by joint venturer Atlantic Records, a Time Warner company. He stated that one of the people at Atlantic Records he was familiar with was a gentleman by the name of Melvyn Lewinter. In his testimony, Mr. Munao set forth that he had a conversation with Mel Lewinter a day or two after he was approached by Tommy Boy in connection with the possible signing of an involuntary bankruptcy petition (T. 153 to T. 161). Mr. Munao stated that he valued Mr. Lewinter's advice and that inasmuch as Mr. Lewinter was an executive in the Time Warner family he wished to obtain Mr. Lewinter's counsel. It is also known at this time that Atlantic Records was a customer of Landmark in that a record label of Atlantic Records known as "Big Beat" was then being distributed for Atlantic by Landmark. Mr. Munao testified that he received a copy of a January 4, 1994, letter from Mr. Plotnicki to Mr. Lewinter (Exhibit P. 270). This letter, which Mr. Lewinter faxed to Mr. Munao because it makes reference in its last paragraph to Select and Mr. Munao, is important because the last paragraph on page one of the exhibit confirms that Big Beat and Landmark had in place an installment agreement by Landmark to repay its Big Beat debt.

Mr. Melvyn Lewinter testified before the court on June 13, 1995. In the course of this testimony he advised the trier of fact that he was a certified public accountant and he was, at that point, president and chief operating officer of Warner Music U.S. He advised the court he had been in the music business for 30 years and had been with the Time Warner organization since 1970. Mr. Lewinter further testified that in January of 1994, based on the distribution agreement between Landmark and Big Beat, Landmark owed Big Beat 1.3 to 1.5 million dollars. Mr. Lewinter further testified that on January 12, 1995, Landmark paid to Big Beat $125,000 in connection with the outstanding balance (exhibit D–69). Mr. Lewinter faxed the

cover letter from Landmark in connection with the $125,000 check to Jerry Gold (D–155), chief financial officer of Warner Music Group. This was not the normal procedure that Mr. Lewinter followed (T. 514). It is thus noted that several days prior to the filing of the involuntary bankruptcy, Tommy Boy of the Time Warner family received a $50,000 payment from Landmark and Big Beat received the aforesaid $125,000 payment. Thus, Time Warner related companies, within two weeks of the filing of the involuntary petition, were paid $175,000 by Landmark.

Mr. Lewinter expressly testified that on January 10th of 1994, Tom Silverman approached him and asked whether Big Beat would join in the involuntary petition, and Mr. Lewinter said they would not and told Mr. Silverman to check with corporate counsel at Time Warner before going forward (T. 558).

Mr. Lewinter further testified that in his opinion the filing of the involuntary was "insanity" (T. 598). He viewed this as a threat to his cash flow in that it jeopardized Landmark's ability to pay its substantial receivable owed to Big Beat. He further stated, "I was outraged"; and he realized that this would create a possible disgorgement or preference situation if the bankruptcy stood. Mr. Lewinter confirmed the statement of Mr. Munao that Mr. Munao, prior to signing the bankruptcy petition on January 14th, had contacted Mr. Lewinter and sought his counsel. These conversations concluded with Mr. Lewinter advising Select to consult Fred Wistow, a Time Warner attorney. Mr. Lewinter stated that since Atlantic/Big Beat did not have inside counsel they used corporate counsel such as Fred Wistow for legal advice (T. 547). Mr. Lewinter further testified that Big Beat received its agreed upon February and March 1994 payments from Landmark totalling $375,000. It is noted that the February and March payments were tendered by Landmark to Big Beat after the involuntary petition had been filed in January.

In his testimony, Fred Munao further set forth that, after speaking to Mel Lewinter at Atlantic/Big Beat, he proceeded to call Fred Wistow, one of the chief legal officers in the

Time Warner organization. Mr. Munao recalled participating in a conference call with Fred Wistow. Also involved in the conference call to his recollection was Tom Silverman, as well as other personnel at Tommy Boy. The conference call with Mr. Wistow, Mr. Munao, and the Tommy Boy people occurred prior to the filing of the involuntary bankruptcy petition.

Fred Wistow testified on June 13, 1995, before the court. He stated that he is an attorney specializing in corporate law, particularly in the area of mergers and acquisitions. He testified that as of January 1994 he was an employee of the Warner Music Group, that he was senior vice president of legal and business affairs, and that he was legal advisor to Robert Morgado, the leader of the Warner Music Group. He stated that in the fall of 1993 he had been approached by Tommy Boy personnel, particularly Tom Silverman, Dan Hoffman and Peter Takiff. The reason Tommy Boy's personnel had approached Mr. Wistow was in connection with negotiations by Tommy Boy to acquire Profile records in 1993. Mr. Wistow recalled that he was involved in two or three meetings in 1993 in connection with this possible acquisition. Mr. Wistow returned to the stand on June 20, 1995, and this time he testified that he was involved in structuring Tommy Boy's proposals to Profile and made revisions of proposed drafts of contracts in October and November of 1993 (T. 847). In connection with the negotiations between Tommy Boy and Profile, Mr. Wistow, when shown exhibit D–170 in evidence (a draft of a memo from Tommy Boy to Plotnicki dated December 7, 1993), testified that exhibit D–170 had the handwritten notations of Mr. Morgado of the Time Warner Music Group (T. 870).

In December of 1993, in order for Tommy Boy to acquire Profile for ten million dollars, the deal would have to be approved by Tom Silverman of Tommy Boy, as well as by Mo Ostin, then chairman of Warner Bros. Records; and by the chairman of the Warner Music Group, Robert Morgado (T. 864).

Mr. Wistow testified that the Tommy Boy/Profile negotiations reached a "frustration level" to the point where Tommy Boy/ Time Warner personnel felt they were not going to be able to close a deal to acquire Profile in January of 1994.

In his testimony, Mr. Wistow agreed that he did participate in several conference calls in January 1994 with Tommy Boy. Mr. Wistow recalled that two of his calls with Tommy Boy personnel were triggered by specific incidents. He recalled being contacted by Mr. Hoffman and asked by Mr. Hoffman whether Tommy Boy could deposit the $50,000 check received from Landmark. The court notes that Tommy Boy deposited the check on January 14th; thus, Mr. Wistow's conversation with Mr. Hoffman about the depositing of said check would have been on January 14th or the day prior thereto. In addition, Mr. Wistow acknowledged that he had seen a copy of Landmark's attorney's letter dated January 20, 1994, wherein Kaye Scholer, as Landmark's counsel, warned the petitioning creditors not to file the threatened involuntary bankruptcy petition (D–22). Mr. Wistow recalled a conference call which he set up involving Tommy Boy personnel and himself after receipt of said letter. Thus, this conference call involving Mr. Wistow and Tommy Boy occurred on or about January 20, 1994, and was thus held a few days before the involuntary petition was filed. The court finds that at the time of this second conference call between Mr. Wistow and the Tommy Boy personnel, Mr. Wistow and Tommy Boy were both aware of the $50,000 payment by Landmark to Tommy Boy, which was deposited in the Tommy Boy account on Friday, January 14th. Eight days prior to the Kaye Scholer January 20th letter, namely, Wednesday, January 12th, Landmark had paid $125,000 to Big Beat, another Time Warner related entity, and Mr. Lewinter advised the Warner Music Group of the payment. It is also noted that petitioning creditor Select was aware that Landmark had reached an agreement to pay Big Beat in installments pursuant to exhibit P–270.

### TOMMY BOY'S NEGOTIATIONS TO ACQUIRE PROFILE

Mr. Tom Silverman testified before the court for three days from June 21st through June 27th and advised the court that he was

the chairman of Tommy Boy records, which was a subsidiary of Warner Brothers Music. Mr. Silverman advised the court that he had a long time relationship and was good friends with Fred Munao. He testified that in 1993 Fred Munao had advised him that Cory Robbins of Profile and Steve Plotnicki wanted to sever their relationship. Mr. Silverman stated that Tommy Boy was a competitor of Profile in the sense that they both were producing recorded music in the rap genre. The essence of the value of a record company has as its foundation the recording artists that the record company has under contract. Profile had positioned itself as a substantial force in the rap music industry and had under contract "Run–DMC" among other artists. Silverman stated that he knew Cory Robbins of Profile and respected his work, so that when he was advised that Steven Plotnicki and Cory Robbins were dissolving their relationship and that perhaps Profile was available for purchase, he was interested.

Mr. Silverman testified that his initial contact was with Cory Robbins and that Mr. Robbins had advised him that there was in place a buy-sell agreement between Messrs. Plotnicki and Robbins, but that for the past three or four months they had reached an impasse insofar as trying to have a closing pursuant to said buy-sell agreement. Mr. Robbins also advised Mr. Silverman in this early contact that Profile was talking to third parties about a purchase of the Profile assets.

After this initial interest was manifested, a luncheon conference was held between Mr. Silverman and Mr. Plotnicki on August 19, 1993, at a restaurant in New York City. After the early exploratory negotiations, ultimately Tommy Boy signed a confidentiality agreement with Profile and Landmark, and Profile and Landmark opened up their financial records to Tommy Boy in connection with the negotiation process. Mr. Silverman conceded that Landmark and Profile tendered their 1992 financial information (P–156). In addition, Profile/Landmark provided Tommy Boy with income figures as of September of 1993 (P–161).

While the financial information provided to Tommy Boy included the financial profit and loss statement of both Profile and Landmark, Mr. Silverman testified that Tommy Boy never considered the acquisition of Landmark. As the negotiations to acquire Profile continued in the fall of 1993, Mr. Silverman testified that he updated the Warner Music Group in connection with said negotiations. In this context, Tommy Boy submitted drafts of memos and documents in connection with the possible acquisition to Mr. Fred Wistow in the Time Warner legal department. Mr. Silverman testified that he spoke to the chairman of Warner Brothers Records on more than one occasion. Mr. Silverman further testified that the purpose of these conversations was to seek approval for the making of an offer to acquire Profile. On December 7, 1993, a revised proposal was submitted by Tommy Boy to Landmark (D–170). Steven Plotnicki's reply to the December 7, 1993, memo proposal is reflected in exhibit P–167 dated December 8, 1993. Mr. Silverman testified that when he received exhibit P–167 on or about December 8, 1993, he was pessimistic about whether the deal would be able to move forward.

In spite of his pessimism, Mr. Silverman did not call off the negotiations but testified that he authorized a joint oral proposal which Tommy Boy tendered to Messrs. Plotnicki and Robbins. This oral offer was a substantial change from the previous negotiations in two specific ways.

The prior negotiations looked toward separate purchase agreements with Mr. Robbins and Mr. Plotnicki, each being made a separate and distinct offer for their respective interests. In addition, it was contemplated that the Profile assets that would be acquired would include Profile's accounts receivable and that, therefore, ultimately Tommy Boy would own the Profile receivable from Landmark and Landmark would have a continuing obligation to repay its debt to Profile. Landmark's balance sheet as of September 30, 1993, reflects a debt to Profile of $5,742,000 (P–202). The December oral offer was a bulk offer, a single proposal, and it was up to Messrs. Robbins and Plotnicki to divide the money placed upon the table between them. In addition, the accounts receivable were not acquired by Tommy Boy and remained in the

Profile shell. This had the added benefit of not requiring Landmark to pay Profile the substantial debt that was then owed by Landmark to Profile. It is interesting to note that while one bulk offer was being made for the Profile assets, Mr. Silverman conceded there was a side offer by Tommy Boy to Robbins involving a one million dollar bonus; this side offer was not told to Mr. Plotnicki. Tommy Boy was interested in having Mr. Robbins continue to manage the Profile assets that would have been acquired by Tommy Boy, and the bonus was in that context.

In his June 22nd testimony, Mr. Silverman testified that the last written proposal, reflected in exhibit P–119, would have basically paid eight million dollars to Mr. Plotnicki for his share of the Profile assets, excluding Landmark. However, as noted, Landmark would have had an obligation to repay the Profile debt. The joint oral offer simply was for the contracts of Profile's artists, its catalogue of past issued records, and excluded the cash in the company. This oral offer was for ten million dollars, and it would be incumbent upon Messrs. Robbins and Plotnicki to agree between themselves how to divide the ten million dollars. In addition, whatever monies remained in Profile/Landmark would be the property of Plotnicki and Robbins. Mr. Silverman felt that the oral offer was made on December 14th or December 15th of 1994.[9]

Mr. Silverman further testified on June 21, 1995, that after the oral offer was tendered, within a day or two he received a telephone call from Cory Robbins advising him that Steve Plotnicki had walked out of the Profile Record offices and removed all of his personal property from Profile's business office. Mr. Silverman testified that he was advised that there was tension and a dispute between Robbins and Plotnicki as to how to move forward in connection with the Profile sale and how to divide the money between themselves. Shortly before Christmas, Mr. Silverman visited Profile Records at the request of Mr. Robbins and spoke to the Pro-

file employees who were nervous and upset at Mr. Plotnicki's walking out of the offices. On December 23, 1993, Tommy Boy sent a letter to Profile (D–42), basically reaffirming that they were still interested in acquiring Profile's assets. Mr. Silverman testified that at this time in December he started to be concerned about Tommy Boy's ability to collect on the balance of the money owed it by Landmark, and that he pressured Peter Takiff to get moving with collection efforts on the debt. There has been a great deal of testimony from several of the witnesses about the timing of the renewed demand for payment by Tommy Boy. The court finds that the last written reference after payments were stopped in August of 1993, had been a brief reference by Mr. Takiff in a fax to an accounting person at Profile on October 28, 1993 (exhibit P–127) with a sarcastic reference stating:

> Lastly, I understand that Steve is hoarding cash, but it doesn't seem like it would be too much of a strain to ask you to pay us.

In summary, the last payment in the normal course made by Landmark to Tommy Boy is a $40,000 payment in August of 1993. Tommy Boy did nothing until the fax of October 28, 1993, with its brief casual reference to payment (P–127). The next direct communication with Landmark on repayment did not occur until January of 1994, within days of the filing of the involuntary. Mr. Silverman and Mr. Takiff both, in their testimony, agreed that it was in late December, that Mr. Silverman advised Mr. Takiff to step up collection efforts on the Landmark payable. Tommy Boy knew that Landmark had four million dollars in cash in its bank account. While Mr. Silverman stated that he told Mr. Takiff to step up the aforesaid collection efforts, there is no written submission as noted to Landmark at this time. The collection effort appears to have started in a telephone conversation among Messrs. Takiff and Hoffman at Tommy Boy and their general litigation counsel, Charles Ortner, at the

---

9. Had the oral offer been accepted, Plotnicki and Robbins would have had the ten million dollars from Tommy Boy and the approximate four million dollars in cash in Landmark. Landmark's

September 30, 1993, statement (P–202) reflected accounts receivable and inventory sufficient to pay the non-Profile accounts payable.

Paul Hastings firm. Mr. Ortner testified that the initial contact from his client, Tommy Boy, concerning collection of a debt was a five to ten minute telephone call on January 6, 1994. Inasmuch as Mr. Ortner was leaving town on a personal matter, he referred his client, Tommy Boy, to his partner, James W. Kennedy, also of the Paul Hastings firm. It is alleged by Tommy Boy that the idea of a possible bankruptcy was first raised by Messrs. Ortner and Kennedy in the initial telephone contact that Tommy Boy had with the Paul Hastings firm on January 6, 1994. It is noted that Mr. Ortner had no prior real bankruptcy experience, and that James Kennedy testified that prior to Landmark he had no meaningful bankruptcy experience. Both Mr. Ortner and Mr. Kennedy stated that the Paul Hastings bankruptcy department in New York was headed by an attorney by the name of Harvey Strickon.

While Mr. Kennedy and Mr. Ortner testified that they had some general knowledge that Tommy Boy was interested in acquiring Profile and that Profile was related to Landmark, both of said attorneys did not recall specifically ever advising Harvey Strickon, the bankruptcy partner at Paul Hastings, of this fact. Mr. Strickon, for his part, expressly testified that he had no recollection of being so informed prior to the bankruptcy (T. 2218).

In his testimony, Mr. Strickon confirmed that he was head of the bankruptcy group in the New York office of Paul Hastings and that he is the only partner in the New York office that deals with bankruptcy (T. 2161). Mr. Strickon stated that his first contact with the Tommy Boy/Landmark dispute occurred on January 7th, when his partner, Mr. Kennedy, called him about a possible involuntary petition being filed on behalf of their client, Tommy Boy, against Landmark. Mr. Strickon testified that, after the initial contact with his partner, he had a conference call participated in by Mr. Takiff from Tommy Boy as well as Mr. Kennedy from Mr. Strickon's law firm. This conference call occurred later in the afternoon of January 7th. In this call, Mr. Takiff of Tommy Boy advised Mr. Strickon that there was a substantial payable owed to Tommy Boy and that Tommy Boy

advised Mr. Strickon that they were afraid Landmark's assets might be dissipated.

In the initial call with Mr. Takiff on January 7th, Harvey Strickon went over at some length the mechanics of filing an involuntary and what the proceeding would entail. In his direct testimony, Mr. Strickon gave the following account of his conversation with Mr. Takiff as respects the issue of bad faith:

*Harvey Strickon—direct:*

Q. Prior to the filing did you ever speak to Mr. Takiff or anyone else at Tommy Boy or affiliated with the other petitioners about what might constitute a bad faith filing?

A. Yes.

Q. With whom did you speak?

A. Mr. Takiff.

Q. Only Mr. Takiff?

A. And possibly Mr. Hoffman.

Q. And what did you say on that subject?

A. I paraphrased or actually read from the bankruptcy code about dismissal of the petition and award of damages if it was found that the petition was filed in bad faith.

Q. But did you discuss with them what bad faith meant in the context of the statute?

A. Yes.

Q. What did you say?

A. I said to them in general terms, not specifics, that in my view bad faith meant either a total and reckless disregard for the truth, what was going on, or that the petition was being filed to accomplish an ulterior motive, such as vindictiveness.

Q. Do you believe you fully informed the petitioners with respect to the concerns about bad faith?

A. Yes.

Q. Do you believe they understood the advice you gave them?

A. Yes.

(T. 2289–2290.)

After the January 7th call, Mr. Strickon stated he did not hear from Mr. Takiff for six

days. Mr. Strickon's next contact was approximately January 13th or 14th when he received an inquiry from Mr. Takiff about whether Tommy Boy could accept the $50,000 partial payment from Landmark. Mr. Strickon also stated that in addition to not being told about the Profile acquisition negotiations, he was never told that Atlantic Records had been paid $125,000 on January 12th. In fact, when talking to Mr. Takiff about possible other parties joining in the petition, the subject of Atlantic had been raised and Mr. Takiff had advised Mr. Strickon that it was "unnecessary to contact Atlantic Records" (Big Beat) (T. 2235). Mr. Strickon also stated that Mr. Takiff, the Tommy Boy representative, did not advise him that Tommy Boy had in its possession financial statements for Profile and Landmark (T–2256). In addition, Tommy Boy never advised its bankruptcy counsel, Mr. Strickon, that it agreed to pay all the fees for the petitioning creditors (T. 2257). Mr. Strickon was also not told that Select is a Time Warner Company (T–2228).

The court notes that, while Mr. Takiff and Mr. Silverman stated that they were pursuing the bankruptcy because they felt the assets of Landmark would be dissipated, Mr. Strickon was not as clear in his recollection as to that being one of the prime concerns of the client. The court also notes that the involuntary petition, when filed, was served by mail, which tended to extend the time the alleged debtor had to respond and seek a trial on the issue of whether the bankruptcy case should proceed. Further, no efforts were made to seek an emergency interim trustee to preserve the assets of Landmark, which is provided for in Bankruptcy Code section 303(g).

Five days before the involuntary petition was filed, a confidential, in-house memo was circulated among the Tommy Boy and Time Warner personnel (P–168). This memo was written by Dan Hoffman at Tommy Boy and is forwarded to Mr. Fred Wistow as counsel at Time Warner, and to Colin Hodgson, a financial officer at Time Warner. Said memo of January 20, 1994, notes that Tommy Boy had advised Profile that there would be no further discussions on acquisition of Profile until all amounts owed to Tommy Boy by Landmark were paid. In addition, the memo states that in the future Profile would be advised that an involuntary petition against Landmark may be filed if payment is not received. The memo has attached to it a *Billboard* magazine article from the January 22nd issue of *Billboard* magazine. *Billboard* is a trade publication, and virtually every witness before the court engaged in the music industry conceded that *Billboard* is the industry bible and that everyone reads *Billboard* magazine the day it is issued. The parties are also in agreement that while the article in question attached to exhibit P–168 was dated on its face January 22; actually the article was released to the public several days prior thereto, so that the article was published prior to the January 20, 1994, memo.

It is most interesting to note that, while the memo (P–168) and attached *Billboard* article which deals with the Tommy Boy/Profile negotiations in great detail was forwarded to Fred Wistow, Time Warner's counsel, on January 20th, the bankruptcy attorney retained by Tommy Boy, Mr. Strickon, testified that he did not receive said memo nor did he ever see the attached *Billboard* article until after the involuntary petition had been filed (T. 2220). Mr. Strickon also testified that had he known through the *Billboard* article that Tommy Boy's offer to buy Profile was on the table as late as January 24, 1994, his advice to his client about the involuntary may have been different (T. 2275).

### LANDMARK DISTRIBUTORS— HISTORICAL BACKGROUND

Mr. Steven Plotnicki testified that Profile Records had been founded in 1981 by himself and Mr. Cory Robbins, each of them owning approximately 50% of Profile. During its history Profile had 15 gold and platinum albums. Mr. Plotnicki testified that in order to help market Profile's records Landmark was founded in 1985 or 1986. He testified that three people originally incorporated Landmark: himself and Mr. Robbins, each owning one-third of the original Landmark stock; and another gentleman holding one-third of the stock. In 1991, a Mr. Goldstein

became the third owner of Landmark's stock, owning approximately 12% of the stock. Thus, from 1991 on, Landmark Distributors was owned 12% by Mr. Goldstein, 44% by Mr. Robbins, and 44% by Mr. Plotnicki. By 1991, Landmark had become a national distributor and, in the same year, became Profile's exclusive distributor. Both Landmark and Profile are subchapter "S" corporations.

Mr. Plotnicki further testified that most of the profits for both Profile and Landmark are reflected in officers' substantial salaries taken by himself and Mr. Robbins. These salaries are reflected in the Profile financial statement.

The historical earning history of Landmark was known to Tommy Boy. Mr. Silverman acknowledged that in the information exchange in connection with the possible purchase of Profile by Tommy Boy, he received exhibit P–156 on or about October 14, 1993. Said exhibit (P–156) advised Tommy Boy that the net sales for the companies were $27,885,118.90 for Landmark, and $10,795,-599.26 for Profile. The same exhibit reflects the cost of sales for both corporations and reflects a gross profit for Landmark as of September 30, 1993, of $4,656,892.99.

Through exhibit P–156, Tommy Boy was also advised, in October of 1993, that Landmark has $3,986,611.26 in cash in its bank account; and Profile for the same period September 30, 1993, has cash in its bank account of $231,987.72.

Mr. Peter Takiff, chief financial officer for Tommy Boy, also testified that in the negotiation process for the acquisition of Profile he was very familiar with exhibit P–156 and that he had reviewed said exhibit. He confirmed that the exhibit did set forth the sales information and income information for both Landmark and Profile for the fiscal years ending September 30, 1993, and September 30, 1992.

The relationship between Profile and Landmark and how the earnings of the two companies are tied together is reflected in the testimony of Mr. Silverman who noted in his testimony that Landmark only existed because of Profile (T. 1170, l. 6–8). Mr. Silverman and Mr. Takiff both further testi-fied that one of the benefits they hoped to achieve by Tommy Boy's acquisition of Profile was that Tommy Boy would distribute Profile's records through the Tommy Boy distribution network which was already in place. In this context, Colin Hodgson, senior vice president and chief financial officer for Warner Bros. Records, prepared a memo on October 28, 1993, circulated to Mr. Silverman and Mr. Takiff, among other parties, reflecting financial projections of the benefit of the acquisition of Profile by Tommy Boy (P–162).

Said exhibit further notes that, in addition to Profile generating a $935,000 annual profit from its own independent operation, there would be a residual benefit to Tommy Boy through the distribution rights of Profile's records. Paragraph 4 on the first page of exhibit P–162 notes that if Tommy Boy charges Profile a distribution fee of 15%, the profit contribution to Tommy Boy's bottom line from the distribution of Profile's records would be 90% of the amount due from Profile. Exhibit P–162 prepared by Time Warner and Tommy Boy reflects in excess of $2,000,000 each year to the Tommy Boy bottom line in connection with distributing Profile's records.

The financial statement for the year ended September 30, 1992 (P–201) further reflects that Landmark purchased from Profile $12,-380,000 worth of records. For the comparable period in 1993, exhibit P–202 discloses a decrease in Landmark's purchases from Profile to $11,035,000. Mr. Silverman testified that he was aware that during the last six months of 1993, Profile issued fewer new releases than it had historically.

The court find that there was a general deterioration throughout 1993 of the working business relationship between partners Plotnicki and Robbins as they tried to disentangle their business relationship and co-ownerships of Profile and Landmark. Mr. Plotnicki, in his testimony, has stated that as early as April of 1993 Landmark started slowing its payments to Profile. It is also noted that Cory Robbins, in his testimony, stated that he had virtually nothing to do with the operation of Landmark. Mr. Plotnicki was concerned with the distribution of records; Mr. Robbins with the artistic pro-

duction. Mr. Robbins did acknowledge that he was aware that Profile's business was slowing down by the end of 1993. The deterioration in the business relationship between Messrs. Plotnicki and Robbins as they continued negotiations resulted in Mr. Plotnicki removing himself from the Profile offices in late December of 1993. The court finds that the 1993 disputes between Messrs. Robbins and Plotnicki as to how they could sever their business relationship justifies the reliance by Landmark's expert, Mr. Tietbohl, on the Landmark financial data as of September 30, 1993. While he stated he reviewed the actual operations for October, November and December of 1993, he stated he was aware from the information provided by management that a number of things were going on in connection with the closing of an Atlanta warehouse previously operated by Landmark, as well as the shareholder negotiations that were underway that tainted the October to December 1993 Landmark data. This reliance on the financial information as of September 30, 1993, by Mr. Tietbohl was found to be reasonable in view of the friction and consternation that was manifested in the testimony between Messrs. Plotnicki and Robbins from the spring of 1993 to the end of the year. This tension became particularly egregious in the latter three months of 1993, resulting in Mr. Plotnicki's aforesaid walkout in December.

### ANALYSIS OF THE PERIOD LEADING UP TO FILING OF INVOLUNTARY BANKRUPTCY

Since mid-December 1993, Mr. Plotnicki had moved out of the Profile offices and was working out of Landmark's offices. There was intense conflict between Messrs. Plotnicki and Robbins as to the dissolution and distribution of their assets which were tied up in Profile and Landmark. Messrs. Plotnicki and Robbins had before them their previously entered into buy/sell agreement as a method of dividing their assets. In addition, they had on the table the oral offer of Tommy Boy to purchase certain Profile assets for the sum of $10,000,000.

The Tommy Boy telephone bill was placed in evidence as exhibit D–15. Said document reflects that on January 6, at 6:19 in the evening there was a twenty-minute telephone conversation from Mr. Silverman to Mr. Plotnicki. Mr. Silverman, in his testimony, recalled that in this conversation Mr. Plotnicki expressed his frustration with his inability to make a deal with Mr. Robbins and requested that Mr. Silverman speak to Mr. Robbins in an effort to bring the parties together so that a deal could be made and the Tommy Boy proposal brought to fruition. It appears the frustration level of all parties was fast approaching a boiling point as of January 6. It is the testimony of both Mr. Silverman and Mr. Takiff that the first idea of an involuntary bankruptcy surfaced during conversations on January 6 between Mr. Takiff and Messrs. Ortner and Kennedy of the Paul Hastings firm.

Mr. Cory Robbins and his attorney, Mark Levinson, had dinner at approximately 9:30 p.m. at a restaurant in New York City on January 6, 1994. Mr. Silverman testified that he joined them for drinks that evening and reviewed the matters that were on the table concerning the buy-out by Tommy Boy. Mr. Silverman has also testified that at this January 6th meeting he advised Mr. Robbins that in order to prod Robbins and Plotnicki to move forward Tommy Boy was tendering an ultimatum. The substance of the ultimatum was that the price offered by Tommy Boy, then at $10,000,000, would be dropped one million dollars as of January 14th, and that the entire package taken off the table if it was not accepted by January 21, 1994. The court finds that there was no mention to Mr. Cory Robbins of the possibility of an involuntary bankruptcy being filed at this January 6th dinner meeting.

The relationship between Mr. Robbins and Mr. Plotnicki is so fraught with tension over their inability to come to an agreement on selling their business that they mutually started putting economic pressure on one another. Mr. Plotnicki, while controlling Landmark, greatly slowed down the payment of Profiles' bills. Mr. Robbins found a bank account in Landmark's name with $250,000 in it and without advising Mr. Plotnicki attempted to move the account under his control and to pay the funds to Profile. (T.

4484–4485.) Mr. Robbins also asked his attorney to write to Profile's record manufacturers and cut off all shipment of Profile Records to Landmark on January 10, 1994. (T–4497 and exhibit P–274).

The court further finds that the first threat of an involuntary bankruptcy is raised in a conversation between Mr. Hoffman of Tommy Boy and Mr. Levinson, acting as counsel for Messrs. Plotnicki and Robbins, in a telephone conversation held on January 20, 1994, memorialized by notes taken of the conversation by Mr. Levinson (exhibit P–297). The court notes immediately upon receiving this telephone call on January 20, 1994, bankruptcy counsel was consulted by Landmark, and on the same day a letter was sent by Kaye Scholer, as attorneys for Landmark, to Tommy Boy, Select and Max, the then three threatening petitioning creditors (exhibit D–22).

At the same time that Tommy Boy was pressing Profile/Landmark in connection with the Tommy Boy acquisition, Plotnicki and Robbins were in heated negotiations concerning severance of their relationship through a buy/sell agreement. Tommy Boy attempted to show that certain bank transfers in January of 1994 rendered Landmark insolvent. The court does not so find. Much of the monetary information learned by Tommy Boy was discovered in pretrial preparation and was not known at the time the involuntary was filed and is thus not probative as to Tommy Boy's motive or good faith. In addition, the court finds that Landmark's bank records in January of 1994 do not reflect that Landmark was not paying its debts as they became due. Exhibits P–539 and P–541 reflect Landmark's cash on the filing date at $943,146.85; the day after the filing, January 26th, cash in the bank is $1,271,468.44. On January 27th, there is a wire transfer to Profile, and the Landmark cash is at $512,969.

Mr. Robbins has testified that by January 21, 1994, he and Mr. Plotnicki had reached an agreement in principle where Mr. Plotnicki would buy out Mr. Robbins. Because Tommy Boy had agreed to keep Robbins on as Profile's president if the Tommy Boy deal had closed, Robbins felt he owed Mr. Silverman a courtesy phone call. Mr. Robbins testified he called Mr. Silverman on Friday, January 21, 1994, and told him a Robbins–Plotnicki closing was about to take place (T. 4508).

Mr. Robbins testified the closing with Mr. Plotnicki actually started late in the day on Monday, January 24th, and concluded early in the morning on January 25, 1994 (T. 4507). The involuntary petition was filed a few hours later.

All of the transfers in the Landmark bank accounts in January of 1994 must be viewed in the context of the dispute between Messrs. Plotnicki and Robbins as well as their ultimate agreement on the terms of a buy-out.[10]

Mr. Plotnicki states that Landmark was mortally wounded by the bankruptcy filing. He particularly notes that the news of the involuntary filing was published in *Billboard* and had a severe and immediate impact on Landmark's relationship with its customers. The petitioning creditors assured wide dissemination of the news of the bankruptcy filing by faxing a copy of the petition to *Billboard* magazine twenty-four hours after the petition was filed (T. 2076). Mr. Plotnicki also noted that Landmark remained in business from the January 25th filing date until Landmark closed its doors April 8, 1994. Douglas Bail, Landmark's former vice president and general manager, testified that after the filing Landmark was able to pay through cash and returns $1,960,000 to its vendors in the period January to May of 1994 (T. 3605).

### BADGES OF BAD FAITH BY PETITIONING CREDITORS

■ Based upon the record, the court finds the following facts support the conclusion that Tommy Boy, Select, and Max filed the involuntary bankruptcy petition in bad faith:

---

10. After the trial, petitioning creditors moved to have this court reconsider the March 24, 1994, dismissal of the involuntary petition. The gravamen of this motion is the Landmark bank accounts. Said motion is denied.

(1) Landmark had resumed paying Tommy Boy with the $50,000 payment deposited January 14, 1994 (D–21).

(2) Select knew that Landmark had made arrangements to pay Time Warner's subsidiary, Big Beat, in installments. (January 4, 1994, letter, Plotnicki to Lewinter, which was forwarded to Mr. Munao (P. 270.)

(3) Landmark paid Big Beat, a Time Warner company, $125,000 on January 12, 1994.

(4) While Tommy Boy asserted it feared Landmark's assets were being dispersed, it waited from January 14th, when the petition was signed, until January 25th, to file it.

(a) When the petition was filed, it is mailed to Landmark rather than personally served (D–143).

(b) Petitioning creditors failed to seek an immediate, interim trustee to preserve assets under Bankruptcy Code § 303(g).

(5) Tommy Boy retained bankruptcy counsel, Harvey Strickon, then failed to provide him with key facts.

(a) Strickon not told Tommy Boy had Landmark historical financial data.

(b) Bankruptcy counsel was not told that Tommy Boy had been attempting to acquire Profile, an affiliate of Landmark, for ten million dollars.

(c) Strickon was not told that the offer to buy Profile was still viable and on the table up until Friday, January 21st.

(d) The January 20th memo (P–168) from Tommy Boy to Time Warner's counsel, Fred Wistow, and attached *Billboard* magazine article were not forwarded to bankruptcy counsel.

(e) Counsel was not told that Select and Tommy Boy were both part of the Time Warner family.

(f) Mr. Takiff told Mr. Strickon it is not necessary to contact Atlantic Records, and thus bankruptcy counsel never learned of Landmark's $125,000 payment to Big Beat on January 12, 1994.

Based upon the above, the court finds that Tommy Boy and Mr. Silverman were frustrated that their quest to acquire Profile, which began in earnest in September of 1993, ended in failure in January of 1994. This business frustration and personal dislike for Mr. Plotnicki of Landmark led Tommy Boy to solicit creditors and file the involuntary petition. The court finds the filing of the involuntary petition was not for legitimate business reasons but was filed for vindictive motives to punish Plotnicki and Landmark for the breakdown in acquisition talks. This fact is highlighted by the point that Fred Lewinter of Atlantic/Big Beat (who was owed by Landmark three times more money than Tommy Boy) refused to join the involuntary petition. When Mr. Lewinter read in *Billboard* magazine that the bankruptcy had been filed, he thought it was "insanity" from a financial point of view (T. 598). Mr. Lewinter also testified that upon reading of the involuntary bankruptcy, he expressed his dismay to Fred Wistow, senior vice-president of legal and business affairs of the Warner Music Group, and to Jerry Gold, chief financial officer of Warner Music Group. Despite these statements in January of 1994, Tommy Boy moved forward with the trial of the involuntary in March of 1994.

This court concludes the bankruptcy was filed for punitive reasons to punish and destroy Landmark because of Tommy Boy's frustration over the failure to close on the Profile deal. One day after the bankruptcy petition was filed, Mr. Silverman instructed Mr. Takiff to fax a copy of the petition to *Billboard* magazine so that the Wednesday publication deadline could be met. This assured Tommy Boy that the news of the filing would be published by *Billboard* twenty-four hours after the bankruptcy was filed (T. 2076, l. 8–24).

Tommy Boy and the petitioning creditors herein pursued nothing less than the death of Landmark when they pressed forward with the involuntary chapter 7. They did not seek to reorganize Landmark; they sought the termination of Landmark as an entity and the division of its assets among its creditors.

One definition of the word "bankruptcy" notes the term is derived from the Latin *bancus*, meaning table or counter, and *ruptus*, meaning broken. Thus, the word bankrupt has as its origins the medieval practice of breaking the bench of an artisan who had

failed to pay his obligations to the guild.[11] Once the bench was broken, the artisan was physically not able to perform his craft and was driven from the guild; death by starvation was a real prospect. While the filing of the petition *sub judice* did not cause the literal death of any natural person, the court notes the economic harm, nonetheless, was as dramatic and as fatal to Landmark as a corporation and to its employees and stockholders. Sir Edward Coke noted in the case of *Sutton's Hospital,* 77 English Rep. 960, 973 (1612):

> Corporations ... cannot commit treason, nor be outlawed, nor excommunicated, for they have no souls....

While Tommy Boy, the corporation, has no soul, the federal Congress has empowered this court to hold Tommy Boy and the other petitioning creditors accountable for their actions. The court thus makes the following findings on the issue of damages.

### LAW ON DAMAGES

*Remedies Pursuant to 11 U.S.C. Section 303(i)*

Landmark's entitlement to an award of damages is governed by section 303(i) of the Bankruptcy Code. That section provides as follows:

> If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—
>
> (1) against the petitioners and in favor of the debtor for—
>
> (A) costs; or
>
> (B) a reasonable attorney's fee; or
>
> (2) against any petitioner that filed the petition in bad faith, for—
>
> (A) any damages proximately caused by such filing; or

> (B) punitive damages.

As has been generally recognized, in light of Code section 303, petitioning creditors should carefully examine the risks undertaken in the filing of an involuntary petition. Weintraub and Resnick, *Bankruptcy Law Manual,* § 2.17 (1992); 2 *Collier on Bankruptcy,* ¶ 303.39 (15th ed. 1995). The court in *In re McDonald Trucking Co., Inc.,* 76 B.R. 513, 516 (Bankr.W.D.Pa.1987) stated:

> The filing of an involuntary petition by a creditor must be carefully scrutinized by the Court because such action is extreme in nature and carries with it serious consequences to the alleged debtor, examples of which include loss of credit standing, interference with general business affairs and public embarrassment.

The court in *In re Advance Press & Litho, Inc.,* 46 B.R. 700, 702 (D.Colo.1984) warned that the filing of an involuntary petition is not something which should be lightly undertaken. The court noted that even the good-faith filing of such a petition creates onerous circumstances for a debtor. Moreover, in *In re R.N. Salem Corporation,* 29 B.R. 424 (S.D.Ohio 1983), the court admonished that the Bankruptcy Code was created by Congress to act as a shield for debtors, rather than as a sword for creditors.

The statute is clear in providing that whether or not an involuntary petition is filed in bad faith, the court may grant judgment against unsuccessful petitioners for costs and attorneys fees. *In re K.P. Enterprise,* 135 B.R. 174, 176 (Bankr.D.Me.1992). As has been recognized by the bankruptcy court within this circuit, clearly the granting of such an award is discretionary.[12] *In re David J. Ross,* 135 B.R. 230, 234 (Bankr. E.D.Pa.1991). With respect to an award of costs and fees, there is a split of authority.[13] Some courts have held that one who successfully defends against an involuntary petition

---

**11.** Blackstone's *Commentaries on the Law,* edited by Bernard C. Gavit, Washington Law Book Co. (1941), at page 495.

**12.** See *In re Ross,* 135 B.R. at 235 (indicating that the statute itself provides no framework or list of factors Congress expected courts to consider in the exercise of their discretion).

**13.** See *In re Anderson,* 95 B.R. 703, 704 (Bankr. W.D.Mo.1989), recognizing that two somewhat disparate lines of reasoning have been developed by the courts as to the award of costs or attorneys fees.

should generally be granted the costs and fees associated with its defense. This line of authority begins with *In re Howard, Neilsen & Rush, Inc.*, 2 B.R. 451, 453–54 (Bankr. M.D.Tenn.1979) where the court provides insight into the development of the current law under § 303(i).[14] There the court discussed the fact that the old equitable standard for an award of costs and fees, limiting the award to situations involving bad faith or oppressive and vexatious conduct on the part of petitioning creditors, has been drastically altered by the Bankruptcy Code which now contemplates a routine award of costs and counsel fees under § 303(i) upon dismissal of an involuntary petition. No bad faith need be shown. Under this line of cases, *In re Camelot*, 25 B.R. 861, 865 (Bankr.E.D.Tenn. 1982) holds, in pertinent part, that bad faith on the part of a creditor filing an involuntary petition is not a condition precedent to an award of costs and attorneys fees on dismissal of the petition.

Similarly, *In re Advance Press and Litho, Inc.*, 46 B.R. at 703, holds that it is not necessary that the involuntary bankruptcy petition be frivolous or meritless to award costs and attorney fees upon dismissal of the petition, nor is there a need to make a finding of bad faith on the part of one or more of the petitioners under section 303(i); *See also, In re Leach*, 102 B.R. 805, 808 (Bankr.D.Kan. 1989); *In re Anderson*, 95 B.R. 703, 705 (Bankr.W.D.Mo.1989); and *In re K.P. Enterprise*, 135 B.R. at 177.[15] Other courts have found that fees and costs should not be awarded unless there is a finding of bad faith. *In re Allen Rogers and Company*, 34 B.R. 631, 633 (Bankr.S.D.N.Y.1983) (sufficient cause must be shown to award the debtor costs and fees under § 303(i)); *In re Nordbrock*, 772 F.2d 397 (8th Cir.1985) (holding that district court did not abuse its discretion declining to award debtor attorney's fees on creditor's appeal from dismissal of

involuntary petition in bankruptcy court); *see also, In re Fox Island Square Partnership*, 106 B.R. 962, 967 (Bankr.N.D.Ill.1989) (holding that although § 303(i) does not require a bad faith filing, few courts have assessed cost and attorneys fees absent a bad faith finding); *In re West Side Community Hospital, Inc.*, 112 B.R. 243, 257 (Bankr. N.D.Ill.1990) (employing the court's discretion to deny an award of costs and fees where there was no bad faith finding).

With respect to the award of attorneys fees and costs the court notes the decision of *In re Ross*, 135 B.R. at 238 which held that on dismissal of a petition:

> [T]he burden shifts to the petitioning creditors to present evidence to disallow an award of fees. In that sense, the award of fees is *"routine"* insofar as the award should be made unless the petitioners demonstrate otherwise based upon the totality of the circumstances.... Moreover, once one eliminates the issue of the petitioner's bad faith as a relevant factor in deciding whether to award fees, it becomes difficult to articulate that which a prevailing debtor need demonstrate, beyond dismissal itself, to justify an award under section 303(i)(1). (Emphasis added.)

### COUNSEL FEES AND COSTS

 Upon review of the relevant case law, this court adopts the approach that petitioners should generally anticipate that an award of costs and fees will be granted upon the dismissal of an involuntary petition. The court is mindful, however, that the exercise of its discretion is required on a case by case basis taking into consideration such factors as the reasonableness of the petitioners' actions, their motivation and objectives, and the merits of their view that the petition was proper and sustainable. *In re K.P. Enterprise*, 135 B.R. at 177 (citing *In re Reid*, 854

14. A detailed history of the development of the law under § 303(i) from the Bankruptcy Act of 1898 through the present is set forth in *In re Ross*, 135 B.R. at 235–236 (citing *In re Eastern Erectors, Inc.*, 396 F.Supp. 797 (E.D.Pa.1975) a decision within the Third Circuit discussing an award of costs and fees upon dismissal of an involuntary petition under former Bankruptcy Rule 115).

15. The reasoning behind this line of cases was articulated by the court in *In re Ross*, 135 B.R. at 236, which stated that if the attorneys' fees were limited to bad faith filings, then the fee provision would be found not in subsection 303(i)(1), but in subsection 303(i)(2) (citing *In re Reid*, 854 F.2d 156, 160 (7th Cir.1988)).

F.2d at 160); *see also, In re Allen Rogers & Co.,* 34 B.R. at 632 (the provisions of § 303(i) grant the court case by case discretion as to whether costs and fees should be awarded).

■ As applied to the facts herein, the court is satisfied that an award of costs and fees is appropriate. The oral opinion of March 24, 1994, dismissing the bankruptcy, which findings of fact are expressly incorporated into the matter *sub judice* on damages, as well as the findings of fact herein, indicate that the actions of the petitioning creditors in filing the petition were *unreasonable* and manifested a callous disregard of the adverse impact of the filing on Landmark. As to Max there was a legitimate business dispute with respect to the monies allegedly owed. Similarly, as respects the Select claim, the court has previously concluded that the triggering of a six month "reconciliation period" at the termination of Select's relationship with Landmark compelled the court to find that there was legitimate dispute as to the amount owed.

Significantly, as respects the reasonableness (or lack thereof) of Tommy Boy's claim, the court finds unreasonable the fact that Tommy Boy did not make any written payment demand of Landmark until Profile negotiations terminated in early January, just days before the filing of the January 25, 1994 involuntary petition. Moreover, this court found at the conclusion of the initial trial that the parties had in fact agreed to a suspension or "hiatus" in payment during the negotiations to acquire Profile so that an adjustment or offset could be made at the time of the anticipated closing. For this reason, the court found that there was no reason to demand an acceleration of the payment plan and that Landmark's debt to Tommy Boy was not in default at the time of the filing. In this regard, the unreasonableness of Tommy Boy's actions is amplified even further when the court recalls that when Landmark was pressed for payment by Tommy Boy in early January 1994, it responded with a $50,000 payment.

Petitioning creditors' Tommy Boy and Select urge the court to find that their objective in seeking advice of counsel in January 1994 and ultimately in the filing of the petition was to "secure its receivable." [16] Whatever recognition the court may give to that argument is diminished by the fact that as previously found, upon filing of the petition, the appointment of a trustee pursuant to section 303(g) and section 701 of the Bankruptcy Code was not sought to prevent the alleged "hoarding" of cash by Mr. Plotnicki or Landmark's alleged deteriorating financial condition. Moreover, the court finds that service of the involuntary complaint by mail, rather than by personal service, on January 27, 1995, further dissipates their argument.

In sum, the court concludes that the totality of the facts and circumstances [17] in this case justify a finding that the actions of the petitioning creditors, Tommy Boy, Select and Max, in this case were wholly unreasonable. The court will grant to Landmark an award of counsel fees and costs under section 303(i)(1) of the Bankruptcy Code. Landmark has estimated attorneys fees for defense of the involuntary petition through the trial *sub judice* on damages at approximately $1.5 million (T. 28). Counsel for Landmark shall, within 30 days from the date of the order accompanying this opinion, file an affidavit pursuant to the requirements of Rule 46 of the General Rules of the United States District Court for the District of New Jersey setting forth the services rendered and all counsel fees and costs requested. Petitioning creditors may, within 25 days thereafter, file any objections. Should any objections be filed, a hearing will be held with respect to the awarding of fees upon a date to be set by this court.

### THE BAD FAITH STANDARD AS TO PROXIMATE AND PUNITIVE DAMAGES

■ Prior to any exercise of the court's discretion in awarding damages under sec-

---

**16.** The advice of counsel defense has been rejected for the reasons stated subsequently herein.

**17.** See *In re Ross,* 135 B.R. at 237 wherein Judge Fox held that the "amorphous totality of the circumstances approach is the likely standard that Congress intended for bankruptcy courts to use when deciding issues under section 303(i)(1)."

tion 303(i)(2), the court must determine whether Tommy Boy, Select and/or Max crossed the "bad faith threshold".[18] *In re K.P. Enterprise*, 135 B.R. at 179. The bad faith standard has already been defined by the bankruptcy court of this district in the case of *Matter of Elsub Corp.*, 66 B.R. 189, 196 (Bankr.D.N.J.1986) wherein Judge Gambardella concluded:

> [T]hat in determining whether the instant creditor has exercised bad faith in filing an involuntary petition in bankruptcy, inquiry may be made in to whether the petition was ill advised or improperly motivated, whether the petitioner took affirmative steps to ensure that the petition as filed was proper, and whether the petitioner made sufficient inquiry into the facts and law surrounding the case to determine the total number of claim holders. (Citation omitted.) The bankruptcy court, in examining the conduct of the petitioning creditor must consider whether a reasonable person in the position of the petitioning creditor would have initiated the Bankruptcy process. The Bankruptcy Court must also ascertain the subjective motivations of a petitioning creditor, which is analogous to the consideration of the ulte-

rior motives of petitioning debtors in voluntary bankruptcy proceedings.[19]

Whether or not a petitioning creditor acted in bad faith is essentially a question of fact. *In re Wavelength, Inc.*, 61 B.R. 614, 620 (9th Cir. BAP 1986) (citing *Advance Press and Litho.*, 46 B.R. at 704); *K.P. Enterprise*, 135 B.R. at 179, fn. 13. Courts have, however, developed and applied various tests to make the determination.

Those tests have been referred to extensively by the *K.P. Enterprise* and *West Side Community Hosp.* courts and categorized as:

(1) the "improper use" test, which "finds bad faith when a petitioning creditor uses involuntary bankruptcy proceedings in an attempt to obtain a disproportionate advantage for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum." 135 B.R. at 179 fn. 14; 112 B.R. at 258.[20]

(2) the "improper purpose" test, which finds bad faith based upon the petitioner's improper motivation for filing the petition. Cases under this line of reasoning have emphasized that the petition was motivated by

---

**18.** It has been generally recognized by the courts in considering the issue of damages under § 303(i)(2) that there is a presumption of good faith in favor of petitioning creditors in involuntary bankruptcy proceedings, and the alleged debtor has the burden of proving bad faith. *In re West Side Community Hosp., Inc.*, 112 B.R. at 259 (citing *United States Fidelity & Guaranty Co. v. DJF Realty & Suppliers*, 58 B.R. 1008, 1011 (N.D.N.Y.1986)); *Matter of Elsub Corp.*, 66 B.R. 189, 193 (Bankr.D.N.J.1986) (citing *In re Alta Title Co.*, 55 B.R. 133, 141 (Bankr.D.Utah 1985) (holding that the burden of proving the existence of bad faith is by a preponderance of the evidence standard)).

**19.** Judge Gambardella further noted in *Elsub*, 66 B.R. at 193, that *Black's Law Dictionary* defines "bad faith" broadly as:
> The opposite of "good faith," generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Term "bad faith" is not simply bad judgment or

negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will.
> Citing *Black's Law Dictionary*, 127 (5th ed. 1979).

**20.** Under the "improper use" test, courts have found bad faith where there has been an attempt to use involuntary proceedings in an attempt to gain *control* of a corporation. See *In re Better Care, Ltd.*, 97 B.R. 405, 411 (Bankr.N.D.Ill.1989) (creditors filed involuntary petition in bad faith where evidence indicated that creditors intended to shut down debtor's business); *In re Wavelength*, 61 B.R. at 620 (petition filed as part of jockeying for corporate control); *In re F.R.P. Industries, Inc.*, 73 B.R. 309, 313 (Bankr. N.D.Fla.1987) (finding bad faith where involuntary petition was, in effect, an attempt at a hostile takeover). It also has been utilized where the bad faith involved using the bankruptcy process as a collection tool. See *K.P. Enterprise*, 135 B.R. at 179 fn. 14 and cases cited therein.

ill will, malice or for the purpose of harassing the debtor.[21]

(3) the "objective test", which essentially, asks the question whether or not a reasonable person would have filed the involuntary petition under the same circumstances;[22]

(4) the "subjective test" which is almost identical to the "improper purpose" test in that they both look to the subjective motivation of the petitioning creditor for the filing;[23] and

(5) the "combined" or "two part" test which finds bad faith based upon consideration of both the subjective motivation and the objective reasonableness of the petitioning creditor(s).[24]

As this court notes in the case at bar, findings of bad faith under the above referenced tests often overlap. For example, where an improper use of the bankruptcy process is alleged, such as to harass, destroy, embarrass, or punish the debtor, such motivation is also a bad faith finding under the "subjective test" as well.

### BAD FAITH ON THE PART OF TOMMY BOY

■ Based upon the record before it, the court, as noted, has found that Tommy Boy

acted in extreme bad faith in filing the petition.[25] First and foremost, Landmark had resumed paying Tommy Boy with the $50,-000 payment deposited January 14, 1994 (D-21). As has been indicated, based upon this fact the court has found, in awarding attorney's fees and costs under section 303(i)(1), the actions of Tommy Boy patently unreasonable. This court finds the same actions fail the "objective test" on the issue of bad faith in awarding damages under section 303(i)(2). Second, as has also been heretofore discussed, while Tommy Boy asserted it feared Landmark's assets were being dispersed, it waited from January 14th, when the petition was signed, until January 25th to file it. No interim trustee was sought under section 303(g) to preserve assets. Service was effectuated by regular mail rather than by personal service. Again, unreasonable actions by Tommy Boy which this court finds further fail the "objective test" as well.

Finally, Tommy Boy retained Harvey Strickon of the firm of Paul, Hastings, Janofsky and Walker as bankruptcy counsel, and then failed to provide him with key facts as found herein. The court finds the fact that Mr. Strickon was not apprised of certain information strongly indicates a desire on the

21. The "improper purpose" test has also focused on such motivations as an attempt to "ruin and destroy" the debtor or other malicious attempt to shut down a debtor's business. See *K.P. Enterprise*, 135 B.R. at 179 fn. 15 (citing *In re Salmon*, 128 B.R. 313, 315 (Bankr.M.D.Fla.1991) and *In re Better Care, Ltd.*, 97 B.R. at 411). In *In re Better Care*, 97 B.R. at 412, the court specifically found ample evidence of bad faith where personal antipathy for the debtor resulted in the filing of the involuntary petition. *See also, Basin Electric Power Cooperative v. Midwest Processing Company*, 769 F.2d 483, 487 (8th Cir.1985) *cert. denied*, 474 U.S. 1083, 106 S.Ct. 854, 88 L.Ed.2d 894 (1986); *Fox Island*, 106 B.R. at 967; *Allen Rogers*, 34 B.R. at 633.

22. The objective test was cited by *K.P. Enterprise*, 135 B.R. at 179, fn. 16, as being employed by the courts in *In re Midwest Processing Co.*, 41 B.R. 90, 102 (Bankr.D.N.D.1984) and *In re Grecian Heights Owners' Ass'n*, 27 B.R. 172, 173 (Bankr. D.Or.1982).

23. See *K.P. Enterprise*, 135 B.R. at 179 fn. 17.

24. The cases that employ both subjective and objective findings of fact often use Bankruptcy Rule 9011 as a guide. *K.P. Enterprise*, 135 B.R. at 179, fn. 18; *West Side Community Hosp., Inc.*,

112 B.R. at 258. Bankruptcy Rule 9011 provides in relevant part:

> The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation or administration of the case.

See also, *Landon v. Hunt*, 977 F.2d 829 (3rd Cir.1992) (filing of an improper involuntary petition may expose the petitioners or their attorneys to sanctions under Rule 9011), and *In re Turner*, 80 B.R. 618, 623 (Bankr.D.Mass.1987) wherein the court stated:

> Rule 9011 appears to be all-encompassing in the indicia of bad faith which it sets forth, including a significant objective requirement bearing on the legal justification of a claim or defense: a reasonable inquiry into the facts and the law.

25. See detailed findings in Badges of Bad Faith Section of the within opinion.

part of Tommy Boy to conceal relevant facts which indicate an ulterior malevolent motive in the filing of the petition, thereby failing both the "improper use"/"subjective" test(s) and the "combined test" for a finding of bad faith.

## BAD FAITH ON THE PART OF SELECT

■ Based upon a review of the record the court further finds that the totality of the facts and circumstances in this case indicate that Select in joining in the filing of the involuntary petition also acted in bad faith.[26] Select's bad faith is manifested by the court's finding that Select did not let the Landmark debt to it go through the normal reconciliation process. Moreover, Select knew through exhibit P–270 that Landmark had an installment agreement with Big Beat. While Select claims no knowledge of the Landmark payment to Big Beat, of $125,000 on January 12th, the court finds that Mr. Munao had an obligation to inquire of Mr. Lewinter as to whether or not Landmark was living up to the P–270 installment agreement before filing the petition against Landmark. Mr. Munao has stated he trusted Mr. Lewinter and that he sought his advice and counsel on several occasions before filing. Surely prudence would dictate an inquiry as to whether Landmark was paying Big Beat as agreed before filing the involuntary petition. This knowledge of the P–270 installment agreement, coupled with the failure of Select to make reasonable inquiry into the relevant facts and law before filing of the petition, in addition to their "blind following" of Tommy Boy's lead, causes the court to find Select filed in bad faith.[27]

## COMPENSATORY DAMAGES

### Valuation of Landmark by Tucker Anthony Incorporated

On July 17 and 18, 1995, the court heard the testimony of Landmark's expert, Mr. Jon Tietbohl, a senior vice president of Tucker Anthony Incorporated, a division of John Hancock Mutual Life Insurance Company. Mr. Tietbohl testified that he is co-head of mergers and acquisitions at Tucker Anthony and has been employed by same since 1986. Mr. Anthony has had a long history of experience in the area of valuation including employment, prior to Tucker Anthony, at Parkmore Corporation in Philadelphia, Pennsylvania; Bear Stearns in New York City; and Epler, Gurin and Turner in Dallas, Texas (T. 3173, 3174). Mr. Tietbohl received a masters of business administration degree from the University of Pennsylvania, Wharton School of Business, in 1985 and received his undergraduate degree in finance from Susquehanna University (T. 3175). Mr. Tietbohl's fundamental area of practice is in the execution of merger and acquisition transactions, representing both the seller and the buyer of businesses in terms of negotiating a purchase price with the seller or raising financing to effect the acquisition (T. 3176). Mr. Tietbohl also renders fairness opinions [28] and valuations for a variety of purposes.[29]

Significantly, the court finds that Mr. Tietbohl also has had a great deal of experience valuing companies in the music distribution business. In particular, in connection with his work in that area, Mr. Tietbohl testified to raising some 50 million dollars with respect to the partial sale of one distributor of prerecorded music and assisting that same distributor in the acquisition of several independent label distributors (T. 3183). Mr. Tietbohl also testified to reviewing a great number of other companies in the music distribution business, including "Koch," with 50 million dollars in revenues; "Silo," with 10 million dollars in revenues; and "Ryco Disk," a company which is engaged in both the distribution of music and is an independent label.

---

26. See detailed findings in Badges of Bad Faith Section of the within opinion.

27. The court has assessed counsel fees and costs against Max, but is not assessing other damages against Max.

28. An exercise in valuation to determine whether a consideration received is fair either to the shareholders or to others involved in the transaction. (See T. 3187.)

29. The testimony indicates that the witness provides at least 250 general valuations a year and approximately 15 to 25 written valuations for fairness opinions per year (T. 3181).

The purpose of Mr. Tietbohl's testimony was to reach an opinion with respect to the fair market value of Landmark immediately prior to the filing of the bankruptcy petition (T. 3194). He described for the court the following four methodologies of valuation that are typically employed: (1) comparable sales, an approach which considers other comparable merger and acquisition transactions; (2) discounted cash flow, an approach which values a company by discounting its projected cash streams to a present day value (T. 3198); (3) a review of comparable publicly traded companies and (4) the synergistic approach, which is an assessment of the business from the standpoint of its attractiveness to a potential synergistic or strategic acquirer (T. 3195–3198). Valuation of Landmark was done by three of the above referenced four methodologies (T. 3198).[30]

Upon review of the expert's report (D–137 in evidence), Tucker Anthony was retained by Steve Plotnicki and Landmark in April 1994 to provide financial advisory services for the purpose of providing a written appraisal of the fair market value of Landmark as of January 1, 1994, and to provide testimony at the damages hearing *sub judice*. (Valuation of Landmark Distributors Inc, December 2, 1994, D–137 in evidence, "Valuation Report.") For reasons which have been elaborated

upon in this opinion, Tucker Anthony used the period ending September 30, 1993 as the cut-off for the valuation analysis.[31]

The Valuation Report indicates that in determining the fair market value of the Company, Tucker Anthony considered a number of financial and other factors including, but not limited to, the historical and projected operating results and financial condition of the company, the industry in which it operates, the general economic and financial trends, and a review of the range of indicated equity values discussed therein. (Valuation Report page 1.) At trial, Mr. Tietbohl summarized his findings regarding valuation of Landmark by the above referenced four methodologies. After considering the range of indicated values above, in conjunction with his experience in the music distribution industry and the sum total of prospects and risks facing the Company, he concluded that the fair market value of Landmark as a going concern was between $3.0 to $3.5 million as of January 25, 1994 (T. 3209).

At the outset, the court must note that the Valuation Report, as well as the testimony given at trial, indicates that the most useful or realistic of the four analyses employed for valuation purposes are the review of comparable merger and acquisition transactions and the review of discounted cash flow.[32]

30. Each of the above referenced methods of valuation yielded a range of values for Landmark. Under the comparable sales approach, Tucker Anthony calculated the value range to be between $2.2 million and $8.9 million (D–190). Using discounted cash flow analysis, the value for Landmark ranged between $2.8 and $4.5 million (D–137). The comparable publicly traded companies valuation ranged between $3.2 million and $19.8 million (D–190). The witness also testified that if sold to a strategic acquiror, it could offer substantial earnings contribution of approximately $3.7 million in operating income in its first year of operation. (D–190). (T. 3286–3304.)

31. This court has accepted Tucker Anthony's decision to use September 30, 1993 as the cut-off for the valuation analysis since that is the last annual reporting period before disagreements occurred between Messrs. Plotnicki and Robbins which had a negative impact on the financial condition of the Company. (Revised Valuation Report, D–190 in evidence, page i.) (T. 3870, 3872.) In addition, the Court notes the following specific anomalies for the first quarter '94 figures:

(1) staffing at the Atlanta operation was maintained despite the fact that the facility was shut down, thereby increasing expenses (T. 2630, 3214, 4104);

(2) start-up costs regarding the New Jersey operation increased expenses (T. 2630, 4104);

(3) returns which were unusually high due to transhipping which had caused Landmark to terminate regional vendors, were shipped to New Jersey for processing in the first quarter of 1994 (T. 2030, 4165–66).

32. The Valuation Report indicates that the review of comparable publicly traded companies was considered a more limited indicator of value due to the substantial difference in the overall volume of revenues, breadth of business and growth rate of the comparable group as compared to Landmark. (Valuation Report, page iii.) The Valuation Report does, however, indicate that the review of comparable publicly traded companies does firmly support the viability of the industry segment as a whole and the ability of a strategic acquiror to pursue a growth by acquisition strategy. (Revised Valuation Report dated June 14, 1995, D–190 in evidence, page v, "Revised Valuation Report".)

(Valuation Report page iii.) Moreover, as between the methods of comparable merger and acquisition transactions [33] and discounted cash flow, the court finds that the bulk of the testimony in this case focused on the latter of the two; and for that reason, the court adopts the discounted cash flow analysis as the greater indicator of value.

### Discounted Cash Flow Analysis

With respect to the primary analysis of discounted cash flow, using projected financials provided by Landmark, Tucker Anthony calculated a range of equity values for the company. The stream of cash flows that were discounted was defined as earnings before interest and taxes (EBIT), to which a full 40% corporate tax rate was then applied to derive EBIT after taxes, to which depreciation and amortization were added, and changes in working capital and capital expenditures were subtracted (Valuation Report page iv.) Based on several working assumptions, Tucker Anthony calculated an estimated equity value of approximately $3.2 million to $3.6 for Landmark as of September 30, 1995.[34] (D–190 at iv.)

The estimate of fair market value is based in part upon the Anthony Adjusted Historical and Projected Statements of Income. (Chart is annexed hereto as appendix 1.)

As can be gleaned from the chart indicating Historical and Projected Statements of Income, Landmark submits that with respect to its calculations of gross profit for years 1991, 1992, and 1993, adjustments were made to increase same in order to reflect an "affiliated transaction" between Landmark and Profile concerning a gross distribution fee arrangement wherein Landmark charged

Profile a 16% distribution fee. Adjustments were made to reflect a gross profit assuming a 17.5% distribution fee (T. 3218–3222).

During his direct testimony, Mr. Tietbohl explained the method whereby Landmark determined its alleged fair market value based upon the discounted cash flow analysis taking into consideration the assumed increase to gross profit. In response to the court's inquiry, Mr. Tietbohl explained that while the actual net sales figures for 1991, 1992 and 1993 were provided, the cost of supply coming from Profile was the figure that was affected by the affiliated transaction. Therefore, the figures representing "cost of sale" in their discounted cash flow analysis were adjusted downward to have a net effect of increasing the gross profit margin (T. 3221, 3222).

The court recognizes that the key to adjusted gross profit is the reasonableness of the "gross fee arrangement" or distribution fee. In this regard, the court accepts the testimony of Landmark's expert Mr. Tietbohl who testified that a gross fee arrangement of 17.5% was a reasonable expectation based upon the fact that many other distributors show a gross profit margin of 20% or higher for distribution of independent label music. (T. 3222–23.) Moreover, the record in this case clearly reflects that Landmark charged many of its largest vendors a gross profit margin or distribution fee of 20% and higher. Specifically, the court finds that, for example, Instinct Records Corp. was charged a 23% distribution fee, Razor and Tie was charged a 20% distribution fee, and Edel America Records was charged a 25% distribution fee (D–202). Moreover, the testimony of Mr. Plot-

---

**33.** As respects comparable merger and acquisition transactions for the period September 1990 through February 1994, Tucker Anthony reviewed, and Mr. Tietbohl testified to four transactions comparable to Landmark's operations for valuation purposes. Those transactions were acquisitions by Alliance Entertainment of Jerry Basin, Inc. in November 1990 for 19.2 million dollars; Encore Distributors in December 1992 for 4.6 million dollars; Titus Oaks Records in September 1993 for 29.2 million dollars; and Abbey Road distributors for 39.4 million dollars.

**34.** The working assumptions upon which this valuation are based are as follows: future expect-

ed cash flows were discounted over the five year period from fiscal 1994 to fiscal 1998. Tucker Anthony applied a range of terminal values from 3.75 to 4.75 × estimated 1998 EBIT. In the analysis, weighted average cost of capital discount rates ranging from 15% to 20% were applied; the rates of discount selected were based on a capital structure of 50% debt to total capitalization, and Tucker Anthony's estimated range of required rates of return for equity and debt investors in a business having investment characteristics similar to those of Landmark. (Valuation Report, D–190 at iv.; T. 3270–3274.)

nicki, in addition to Mr. Tietbohl, indicates that the 17.5% gross profit was conservative in light of the fact that most independent distributors experienced gross profit margins of between 20–29% (T. 3222). Significantly, the court notes that the testimony of Mr. Plotnicki further indicates that Profile is currently paying Alliance Entertainment a gross profit margin equivalent to a 17.5% distribution fee (T. 2571).

Having reviewed the record in this regard, the court finds that there is ample documentation to support a finding that an assumed 17.5% gross fee arrangement between Landmark and Profile was reasonable. In particular, the court notes that there was a unique relationship between these two companies. Specifically, they were both closely held subchapter S corporations which shared a common ownership. For that reason, the court finds, and the testimony indicates, that a number of the decisions that were made by Messrs. Plotnicki and Robbins, including the decision not to maximize earnings at Landmark, were "tax motivated" [35] (T. 3226). Similarly, the court further finds that the decision by Tucker Anthony to remove certain extraordinary and non-recurring expenses for fiscal '93 in arriving at the value under the discounted cash flow analysis was justified.[36] (See Adjusted Historical and Projected Statement of Income Chart.) Moreover, the court accepts the figures provided by Tucker Anthony with respect to 1994 through 1998 projected statements of income and add-back of net cash.[37] (D–190.)

### Petitioners' Assessment of the Landmark Valuation

On July 19, 1995, the court heard the testimony of Tommy Boy's expert, Mr. Le-

mar Swinney, a partner in the accounting firm of KPMG Peat Marwick, LLP. Mr. Swinney testified that he is a partner in the Communications and Entertainment practice of Peat Marwick in New York and has been employed there since 1974, having become a partner in 1985. His responsibilities include servicing of middle market clients with significant "hands on" needs. Mr. Swinney graduated from New York University with a bachelor of science degree in accounting. He became a certified public accountant in 1977 and is a member of the American Institute of CPA's, the New York State Society of CPA's, and other professional associations. In the course of his practice, Mr. Swinney has had experience in assessing the valuation of assets of real estate ventures and related entities. His resumé indicates that he has assisted clients in the evaluation of financial operations, financial liquidity, and the ability of operations to meet debt service requirements. (P–355.) For example, he testified to preparing and/or reviewing financial forecasts and projections with respect to a company called Tee Vee Toons, a small record label with a distribution operation, as well as assisting the American Broadcasting Companies when they liquidated ABC Records and Tapes in 1979–1980. Mr. Swinney was also involved with a company called "Indie" when it purchased a company called "Big State" in 1991. The court notes that in no instance did the witness have experience in preparing written valuation reports.

The purpose of Mr. Swinney's expert testimony was to give his opinion on the reasonableness and propriety of the opinion that was rendered by Tucker Anthony in assess-

---

**35.** The testimony indicates that the decision to pay Profile a management fee of $88,000 as an expense in 1993 was also "tax driven". (T. 4689–90, 4710–11.)

**36.** The court accepts Mr. Tietbohl's independent conclusion that Landmark's expense projections were also reasonable, because looking at the projections as a whole Landmark's EBIT margins—which were calculated after taking into account Landmark's expenses—were projected to be in the range of 2.5 to 5.0%, which Mr. Tietbohl concluded was modest in relation to the profitability of other independent music distributors. (T. 3263–64.)

**37.** Net cash is defined simply as being the difference between Landmark's funded indebtedness and its cash and marketable securities as shown on its balance sheet on September 30, 1993. To illustrate why it is proper to add back the net cash, the Court recalls the testimony of Mr. Tietbohl who gave an example of a person buying a house with a mortgage on it but with a vault of cash inside the house. He testified that one has to take into consideration both the mortgage, since that debt would have to be paid, and the cash in the vault, since that cash could be put into the buyer's pocket (T. 3240).

ing damages in this case, particularly with respect to Landmark's claims for lost value and operational losses (P–355). At trial, the court took notice of the fact that the witness did not have a great deal of experience in matters involving the valuation of a business engaged in the distribution of music in particular, but allowed him to provide expert accounting testimony based upon his qualifications as a partner at Peat Marwick, one of the major accounting firms in this country (T. 3632).

With respect to Landmark's claim for lost value as a going concern in the amount of $3.0 million to $3.5 million, Mr. Swinney contends that the value is based on "questionable assumptions and incorrect analyses." (P–355 at page 4). Tommy Boy claims that the financial projections that were relied upon are inconsistent with Landmark's actual financial results. Essentially, the Peat Marwick Report indicates that: (1) sales projections are unsupported by the financial results in the first quarter of fiscal 1994; (2) gross profits are inflated by assuming a 17.5% distribution fee from Profile; and (3) Selling, General and Administrative Expenses ("S.G. and A. Expenses") are understated considering the expenses Landmark had historically incurred, resulting in an inflated estimate of profitability.

The court, having taken into consideration the Peat Marwick Report and the testimony of Mr. Swinney, rejects each of the above arguments for the following reasons. First, as respects the sales projections, Tommy Boy relied on 1994 financials of Landmark which this court previously found were tainted by the Robbins/Plotnicki dispute and were therefore of no significance in arriving at a valuation range. Second, with respect to the alleged inflation of gross profit by Landmark, this court has also previously found that the distribution fee of 17.5% was justified. Finally, as respects alleged understatement of selling, general, and administrative expenses, absent testimony or evidence to the contrary, this court finds the expenses were in fact reasonably considered by Tucker Anthony as extraordinary and nonrecurring.

## Award of Compensatory Damages

This court, having made a bad faith determination against petitioning creditors Tommy Boy and Select, sufficient to award damages under Code section 303(i)(2), must now use its discretion in setting forth the actual amount of damages to be awarded to Landmark. Mr. Plotnicki testified that while Landmark was going through an internal restructuring from 1992 to 1993, it intended to continue as a national distributor. In 1992 Landmark had 160 record manufacturers with average sales of $75,000 per vendor. In 1993 Landmark had terminated some vendors and was serving 70 of its stronger accounts at average sales per vendor of $275,-000. (T. 2392 to 2395.)

The court finds, based upon Mr. Plotnicki's testimony, that he intended to continue to operate Landmark as a record distributor after the sale of Profile (T. 2406). Mr. Plotnicki further testified that after the Profile deal he might have restructured Landmark into a new successor company because of the identity of Profile and Landmark as a unit in the public's mind. (T. 2425–2426.) The court thus holds that Mr. Plotnicki fully intended to continue the Landmark distribution business after the Profile sale had occurred. This concept of continuing Landmark without Mr. Robbins after the Profile sale is also shown by exhibit P–270, the Plotnicki to Lewinter letter of January 4, 1994.

The court accepts the testimony of Mr. Plotnicki that he first learned of the bankruptcy filing on Thursday, January 27, 1994 (T. 2494). That same day, Mr. Plotnicki received a call from *Billboard* magazine informing him that it had a copy of the bankruptcy petition (T. 2494). Mr. Plotnicki "begged" *Billboard* not to run an article on the bankruptcy (T. 2495), but they went forward and published it. The article appeared in the *Billboard* edition released to the record industry on January 28, 1994. This particular edition was distributed to the eight or ten thousand trade people who attended a trade gathering known as the "MIDEM" convention (T. 2496).

The convention was held in France. Landmark's vendors expressed concern to Mr.

Plotnicki at this convention about Landmark's future. Record manufacturers demanded the return of their inventory held by Landmark (T. 2502). Upon return from the MIDEM convention, Landmark was placed on C.O.D. by its vendors (T. 2509). The release of new records to Landmark by the manufacturers was delayed (T. 2514). Thus, the court finds the filing of the involuntary petition on January 25, 1994, leads to Landmark's closing its doors on April 8, 1994.

In awarding damages, this court is mindful of the fact that the filing in this case administered a fatal blow to a going concern through the process of an involuntary bankruptcy proceeding. The court heard a great deal of testimony regarding damages proximately caused [38] by petitioners in the filing of the petition. The court is satisfied with the testimony of Landmark's expert with respect to the valuation of Landmark as a going concern and accepts the lower figure of his discounted cash flow valuation range. Therefore, Landmark is hereby awarded compensatory damages in the sum of $3.2 million. Having granted said compensatory damages, Landmark's claim for post-filing operating losses of approximately $1.5 million are hereby denied.[39]

**38.** Proximate cause is defined as the "scope of foreseeable risk" which flows from improper conduct. Prosser and Keeton, *The Law of Torts*, § 43 at 297 (5th ed.1984). Cases discussing proximate causation and the awarding of compensatory damages include: *People Express Airlines, Inc. v. Consolidated Rail Corp.*, 100 N.J. 246, 495 A.2d 107 (N.J.1985) (there exists a duty of care to take reasonable measures to avoid risk of causing economic damages, and failure to adhere to this duty allows liability for economic damages proximately caused without physical damage); see also *In re West Electronics, Inc.*, 128 B.R. 905 (Bankr.D.N.J.1991) (Judge Gindin stated proximate cause or legal cause is concept which limits liability on the basis of reasonableness and foreseeability).

**39.** The court denies Landmark's claim for operating losses of approximately $1.5 million. At trial, on July 13, 1995, this court rendered a decision with respect to petitioners' July 6, 1995, Motion in Limine for an Order Precluding Landmark from Introducing Evidence Relating to Certain Elements of its Damage Claim. (Petitioners' July 6th Motion in Limine".) In its July 13th decision, this court disallowed proofs on the subject of what the court referred to as a "new damage theory" which included "cash shortfall."

## PUNITIVE DAMAGES

■ The case law in this area makes it abundantly clear that the court has discretion in the awarding of damages under Code section 303(i)(2). *In re Godroy Wholesale Co.*, 37 B.R. 496, 499 (Bankr.D.Mass.1984) (the awarding of damages is permissive and properly within the discretion of the court); *see also, In re Better Care, Ltd.*, 97 B.R. 405, 410 (Bankr.N.D.Ill.1989) (the awarding of damages is not automatic but is committed to the sound discretion of the court). Significantly, with respect to the matter herein, the court specifically notes that, as was recognized by the court in the case of *Matter of Ramsden*, 17 B.R. 59, 61 (Bankr.N.D.Ga.1981), the remedies under § 303(i) are not exclusive. That is, the court may grant the "entire panoply" of damages provided for therein. *In re Better Care Ltd.*, 97 B.R. at 410. In *Ramsden*, the court stated in relevant part:

> The enlightening instruction of the legislative history is that Congress did not intend that the term "or," used three times in section 303(i), be exclusive. The damages allowed may be alternatively or cumulatively assessed.

The court specifically found that Landmark, in its July 11th Bench Memorandum in Opposition to Petitioners' Motion, stated that (in its supplemental responses to Petitioners' interrogatories), "Landmark replaced the operating loss components of its damage claim with an amount representing the "shortfall," (i.e., the difference between the proceeds of liquidation of Landmark's assets available for payment to creditors and the remaining claims of the creditors), suffered by Landmark as a result of petitioners' bad faith commencement of the involuntary bankruptcy." The Court went on to state that it was preserving the right of Landmark to seek compensatory and punitive damages under § 303(i), but disallowing the operating loss/cash shortfall claim by its *in limine* ruling (T. 2801–06). In so holding, the Court relies on the line of cases submitted by petitioning creditors in their Trial Memorandum, which find that damages recoverable for the destruction of a business may be computed either as the going concern value or, in the alternative, its loss of future profits, but not both. The Court finds in this case that Landmark's counsel attempts to create a new damage category called cash short fall; however, the Court finds $3.2 million in compensatory damages is sufficient to make the alleged debtor whole and is therefore all it is entitled to under § 303(i).

17 B.R. at 61. Similarly, the court in the case of *In re Advance Press and Litho, Inc.,* 46 B.R. at 705–706, recognized that, unlike state law which provides that exemplary damages bear some reasonable relation to actual damages, the Bankruptcy Code under section 303(i)(2) specifically authorizes punitive damages even in the absence of or in addition to actual damages. Further, punitive damages were specifically ordered in *In re Grecian Heights Owners' Assn.,* 27 B.R. at 172–173, under § 303(i)(2)(B) where no recovery for proximate damages under subsection 303(i)(2)(A) could lie.

█ Landmark requests that punitive damages be assessed against petitioning creditors Tommy Boy, Select and Max. The court in the exercise of its discretion in awarding punitive damages finds that they should be assessed solely against *Tommy Boy* for its actions undertaken in egregious bad faith. In so holding, the court is mindful of the fact that this may well be a case of first reported impression, insofar as the abuse of the bankruptcy system in the case *sub judice* was so blatant and extreme with respect to the totality of the facts and circumstances surrounding the filing of the involuntary petition and the fact that the petition caused Landmark's demise. It is for this reason that the court finds that both of the objectives for an award of punitive damages, that is, punishment and deterrence are justified. In assessing an award of punitive damages, the court in *K.P. Enterprise* elaborated:

> The purposes for assessing punitive damages are to punish the wrongdoer, to deter him from repeating his misdeeds, and to set an example so that others will be dissuaded from engaging in such conduct. (Citations omitted.) Under § 303(i), the inquiry invokes a federal standard, requiring the court to exercise its discretion in a manner that will discourage misuse of the bankruptcy process, without discourag-

ing resort to it in appropriate circumstances. (Citation and footnote omitted.) If punitive damages are called for, the award must be carefully tailored in light of other damages and fees awarded in the case, so that the result implements bankruptcy policy, but is not "unduly harsh."

135 B.R. at 183–184; *see also, In re Laclede Cab Co.,* 76 B.R. 687 (Bankr.E.D.Mo.1987), wherein the court held that punitive damages, which are generally awarded when there is a showing that the wrongful act was intentionally done without just cause or excuse, may also be assessed to punish defendant for outrageous conduct and to deter similar conduct in the future.

The conduct of Tommy Boy has heretofore been found to be malevolent in nature. Such conduct, the court has found, has failed virtually every standard test for a finding of good faith on the part of a petitioning creditor. Insofar as this conduct was directly responsible for the financial demise of the alleged debtor, the court finds that the punishment and deterrence policies of § 303(i) would be served by an award of punitive damages. As applied to the facts of this case, the court finds that the amount of punitive damages which is appropriate without being unduly oppressive, and consistent with the harm caused by the bad faith filing of the involuntary petition is $500,000.[40]

### ADVICE OF COUNSEL DEFENSE

█ Finally, this court finds particularly egregious the advice of counsel defense postulated by petitioners Tommy Boy and Select. In this regard, petitioners contend that they considered various methods of debt collection and they selected bankruptcy based on counsel's advice that bankruptcy offered the only effective way to "secure their receivable." Petitioners cite, *In re Better Care* for the proposition that advice of counsel can excuse "improper use" [41] bad faith.

---

**40.** In assessing punitive damages against Tommy Boy, the Court has reviewed (D–197) Tommy Boy's Income Statement and Consolidated Balance Sheet for the year ended December 31, 1994, which shows that Tommy Boy had net income of $5,508,000 and further shows that Tommy Boy's total assets are over $18 million. The court did not review nor consider the finan-

cial statement nor wealth of Time Warner since Time Warner was not a direct petitioning creditor.

**41.** The improper use referred to here is using the Bankruptcy court as a substitute for customary collection procedures. Where an involuntary petition has been filed for this reason, courts have

While it is true that reliance upon the advice of counsel defense may defeat a section 303(i) claim in certain cases alleging improper use,[42] such an application of the advice of counsel defense bears absolutely no relation to the case at bar. Ironically, the very case cited by petitioners, *In re Better Care, Ltd.*, goes on to state that:

> The existence of malice, spite and ill-will disposes of the defense of reliance on advice of counsel. . . .

Thus, advice of counsel can excuse improper-use bad faith but it *cannot excuse improper-purpose bad faith.* This result follows because where only improper-use bad faith exists, the purpose of the involuntary filing is legitimate of itself. Where the attorney advises the client that this purpose should be effectuated by an involuntary bankruptcy, it is the attorney who is responsible for the improper use, not the client. Where, however, the purpose is improper, the client will usually come into the attorney's office with that purpose already formed. *It is the purpose which constitutes bad faith in such a case and it is the client who is responsible for the purpose.* Here, the petitioning creditors developed their personal antipathy for Sarno, and decided to act upon it, wholly independently from Grasso's advice. They cannot now hide behind that advice when the consequences of their decision are visited upon them.

97 B.R. at 412–413 (emphasis added).

This court is satisfied that the record in this matter contains ample evidence of malice, spite, and ill-will in the form of actions which constitute an "improper purpose" in the filing of the involuntary petition sufficient to defeat an advice of counsel defense.

█ The petitioners' reliance on the advice of counsel defense is also meritless since the defense is only available to those who place good faith reliance on that advice after full disclosure of all the material facts. *United States v. Martorano,* 767 F.2d 63, 66 (3rd

Cir.1985) *cert. denied,* 474 U.S. 949, 106 S.Ct. 348, 88 L.Ed.2d 296 (1985).

The Third Circuit has instructed in the case of *United States v. Traitz,* 871 F.2d 368, 382 (3rd Cir.1989):

> It must be remembered that the advice of counsel defense is meant to be available only to those who, after full and honest disclosure of the material facts surrounding a possible course of action, seek and obtain the advice of counsel on the potential legality of their actions. (Citation omitted.) The defense is not designed to insulate illegal conduct. (Citation omitted.) Rather, the basis for the defense "is that, in relying on counsel's advise, [a] defendant lacked the requisite intent to violate the law." (citing *United States v. Polytarides,* 584 F.2d 1350, 1353 (4th Cir. 1978).)

This court specifically finds in this regard that a "Chinese wall" was carefully built by the principals of Tommy Boy to insulate Mr. Strickon, as bankruptcy counsel, from the key information concerning the negotiations to acquire Profile. While attorney Kennedy may have been informed of the Tommy Boy/Profile negotiations by Mr. Takiff on January 6th, Mr. Strickon was never so advised (T. 2138). Mr. Strickon testified that he spoke with Mr. Takiff four times; however, the astounding conclusion remains that he was never informed of the fact that Tommy Boy had been attempting to acquire Profile since August 1993; nor was he told that there was an agreed to "hiatus" in payment for the period of the acquisition negotiations. Finally, Mr. Strickon was not told that up until the filing of the petition, there had been an outstanding offer to Messrs. Plotnicki and Robbins with a "drop dead" date of January 21st concerning the deal. The court has also found that the key memo of January 20, 1994, (P–168) sent by Tommy Boy to the Time Warner attorney, Fred Wistow, and the attached magazine article dealing with the negotiations was intentionally not shown to Mr. Strickon until after the filing of the

---

found bad faith. *In re SBA Factors of Miami, Inc.,* 13 B.R. 99, 100 (Bankr.S.D.Fla.1981); *In re Better Care, Ltd.,* 97 B.R. at 411.

**42.** See *In re K.P. Enterprise,* 135 B.R. at 182, citing *In re Walden,* 787 F.2d 174 (5th Cir.1986) (unjust to award fees and costs against petitioner because counsel chose the wrong legal avenue).

involuntary. The court finds that this intentional deception of bankruptcy counsel defeats any ability of the petitioning creditors, Tommy Boy and Select, to raise the advice of counsel defense.

### CONCLUSION

In summary, when Tommy Boy and Select decided to turn to the federal bankruptcy court to punish Landmark when the Profile negotiations failed, they chose to move forward for spiteful and malevolent motives. The court recalls the words of Robert Burton who in his book, *The Anatomy of Melancholy,* 1621 stated: "He that goes to law holds a wolf by the ear."

Therefore, judgment is entered against the three petitioning creditors, Tommy Boy, Select and Max for reasonable costs and attorneys fees, the amount thereof to be fixed by further hearing and order of this court. Judgment is entered against petitioning creditors Tommy Boy and Select for compensatory damages in the amount of $3.2 million. Punitive damages in the amount of $500,000 are hereby assessed against Tommy Boy.

APPENDIX

*Confidential* Page A

### LANDMARK DISTRIBUTORS, INC.
### Adjusted Historical and Projected Statements of Income—
### Tucker Anthony Revised Case One
### (For the Years Ended September 30, $000's)
### Revised Case One—Adjustments to Reflect Extraordinary and Non–Recurring Items

| | $ Income Statement | | | % Income Statement | | |
|---|---|---|---|---|---|---|
| | *Historical* | | | *Historical* | | |
| | 9 Mos. 9/30/91 | 12 Mos. 9/30/92 | 12 Mos. 9/30/93 | 9 Mos. 9/30/91 | 12 Mos. 9/30/92 | 12 Mos. 9/30/93 |
| Net sales | 16,625 | 28,368 | 27,885 | 100.0% | 100.0% | 100.0% |
| Cost of sales | 13,250 | 23,504 | 22,982 | 79.7% | 82.9% | 82.4% |
| Gross profit (1) | 3,376 | 4,864 | 4,903 | 20.3% | 17.1% | 17.6% |
| S,G & A expenses | 3,220 | 4,345 | 4,218 | 19.4% | 15.3% | 15.1% |
| EBITDA (2) | 156 | 519 | 685 | 0.9% | 1.8% | 2.5% |
| Depreciation and amortization | 62 | 104 | 102 | 0.4% | 0.4% | 0.4% |
| EBIT (2) | 94 | 415 | 583 | 0.6% | 1.5% | 2.1% |

(1) The current gross fee arrangement with Profile Records is 16%. Assuming Landmark were an independent entity, the normalized gross fee for Profile sales would be 17.5%. Gross profit has been increased by the amounts below to reflect this adjustment:

| | | |
|---|---|---|
| 83 | 142 | 171 |

(2) Excludes the following extraordinary and non-recurring items:

| | | | | Remarks |
|---|---|---|---|---|
| Moving expenses | 11 | 38 | 28 | Move of headquarters and other relocation expenses |
| Salaries | (2) | 2 | 12 | Reclassification of commission payment and one-time distribution to shareholder |
| Bonuses | 0 | 0 | 0 | Determined not appropriate upon further review |

| | | | |
|---|---|---|---|
| Depreciation expense | 0 | 0 | 0 Determined not appropriate upon further review |
| Other taxes | 0 | 0 | 29 Georgia property taxes from 1988 expensed in 1993 |
| Legal expenses | 0 | 12 | 124 Extraordinary expenses related to disputes with four labels |
| Profile management fee | 0 | 0 | 88 Portion of $150,000 management fee paid to Profile not related to Landmark's operations |
| Merger legal and accounting | 46 | 24 | 2 Relates to merger of affiliated Landmark entities and residual legal work |
| El Roy & Richman Bros. bankruptcy exp. | 0 | 0 | 0 Determined not appropriate upon further review |
| Impact Distributors invoice | (25) | 25 | 0 Invoice received and paid in 1992 for services provided in prior fiscal year |
| Misc. private company expenses | 0 | 60 | 0 Reflects owner's reimbursement for loss on sale of Chicago home and rental of CA home |
| | 30 | 160 | 284 |