**In re CANNON EXPRESS
CORPORATION,
Debtor.**

No. 5:01–bk–80879.

United States Bankruptcy Court,
W.D. Arkansas,
Fayetteville Division.

July 3, 2002.

Donnie Rutledge, Springdale, AR, for Cannon Express Corporation.

Gary Barrett, Stuttgart, AR, for petitioning creditors.

## MEMORANDUM OPINION

ROBERT F. FUSSELL, Bankruptcy Judge.

### I. PROCEDURAL HISTORY

On May 22, 2001, Ed Bennett, Farish Kincaid, and Felix Pruss [Petitioners] filed an involuntary petition under chapter 7 of the bankruptcy code against Cannon Express Corporation [Cannon], a trucking company located in Northwest Arkansas. In their petition, Petitioners alleged total unsecured claims in the amount of $1,333,900.00.[1] On June 13, 2001, Cannon responded to the involuntary petition and filed its Motion to Dismiss and Motion For Judgment For Damages. Cannon asserted that Petitioners had no claim against

---

1. The individual claim amounts were Ed Bennett—$378,800.00; Farish Kincaid—$596,700.00; Felix Pruss—$358,400.00.

Cannon with any basis in either law or fact, and denied that it was not generally paying its debts as they became due. In its motion for damages, Cannon asserted that Petitioners knew or should have known their claims did not meet the tests set forth in 11 U.S.C. § 303.[2] On July 16, 2001, Petitioners filed their Motion For Voluntary Dismissal requesting that the involuntary petition be dismissed without prejudice. After a hearing on July 23, 2001, and over Cannon's objection, the Court granted Petitioners' Motion For Voluntary Dismissal. In its order, the Court found that Cannon did not waive its right to pursue recovery of costs, attorney's fees, and damages under 11 U.S.C. § 303(i).[3]

■ On September 28, 2001, the Court held a hearing on Cannon's motion for damages. The Court bifurcated the § 303(i)(1) issue—cost and reasonable attorney's fees—from the § 303(i)(2) issue—bad faith, damages proximately caused by the filing, and punitive damages. A judgment for costs or attorney's fees under § 303(i)(1) does not require a finding of bad faith. It is generally intended to reimburse an alleged debtor for its expenses incurred in defending an improper involuntary petition. *In re Laclede Cab Co.*, 76 B.R. 687, 693 (Bankr.E.D.Mo.1987). At the conclusion of the hearing, the Court

found that attorney's fees and costs in the amount of $9544.50 were reasonable, and awarded judgment in favor of Cannon and against Petitioners in that amount. The Court entered its Order Granting Request For Attorney's Fees on October 2, 2001.

On February 25–27, 2002, the Court held a hearing on the issues of bad faith, damages proximately caused by the filing, and punitive damages, which are the subjects of this Memorandum Opinion. At the conclusion of the hearing, the Court ordered the parties to file post-hearing briefs on the good faith/bad faith issues, and the damages alleged. Based on the evidence presented at the hearing on February 25–27, the Court finds that Petitioners filed the involuntary petition in bad faith. Cannon is allowed compensatory damages from Petitioners, jointly and severally, in the amount of $14,230.14, and is awarded punitive damages in the amount of $15,000.00 from Bennett, $15,000.00 from Kincaid, and $5000.00 from Pruss.

## II. JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157, and it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

---

**2.** 11 U.S.C. § 303(b) states, in relevant part, An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—
(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or he subject of a bona fide dispute ... if such claims aggregate at least $11,625 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims.

**3.** 11 U.S.C. § 303(i) states:

If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—
(1) against the petitioners and in favor of the debtor for—
(A) costs; or
(B) a reasonable attorney's fee; or
(2) against any petitioner that filed the petition in bad faith, for—
(A) any damages proximately caused by such filing; or
(B) punitive damages.

## III. BACKGROUND FACTS

Cannon is divided into two separate entities, Cannon Express Corporation and Cannon Express, Inc. Cannon Express Corporation is a trucking company that holds Cannon's assets, and is based in Springdale, Arkansas. Cannon Express, Inc. is a publicly traded holding company, and is based in Delaware. Dean Cannon is the president of both corporations, and his family is the majority shareholder in Cannon Express, Inc., the holding company.

Ed Bennett testified that he has sold trucks beginning in 1959, and that he first met Dean Cannon eight to ten years ago. Farish Kincaid testified that he is retired, and that he met Dean Cannon through Kincaid in matters relating to the involuntary petition. Dean Cannon has never met Felix Pruss. The basis for filing the involuntary petition against Cannon appears to involve a series of disputes between Petitioners and Cannon involving three alleged contracts. The first alleged contract involves the amount of money to be paid to Kincaid, or Kincaid and Bennett, for recruiting foreign drivers from Australia and New Zealand. The second alleged contract involves the amount of money to be paid to either the foreign recruiters or to Bennett, Kincaid, and Pruss for the miles driven by the foreign drivers while working for Cannon. The third alleged contract involves the amount of money paid to Bennett for freight either originating in or passing through Cannon's Laredo, Texas, terminal. The Court is not deciding the merits of Petitioners alleged claims against Cannon. Rather, it is only recognizing that a dispute exists between the parties.

## IV. DISCUSSION

### A. STANDARD FOR BAD FAITH

Before exercising the Court's discretion in awarding damages under § 303(i)(2), the Court must determine whether Petitioners filed the involuntary petition in "bad faith." The standard for bad faith is not defined in the code. Whether Petitioners acted in bad faith is a question of fact. *In re Landmark Distribs., Inc.*, 189 B.R. 290, 309 (Bankr. D.N.J.1995). Courts have developed and applied various tests to make that determination. The *Landmark Distributors* court identified the tests as follows:

(1) the "improper use" test, which finds "finds bad faith when a petitioning creditor uses involuntary bankruptcy proceedings in an attempt to obtain a disproportionate advantage for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum."

(2) the "improper purpose" test, which finds bad faith based upon the petitioner's improper motivation for filing the petition. Cases under this line of reasoning have emphasized that the petition was motivated by ill will, malice or for the purpose of harassing the debtor.

(3) the "objective test," which essentially asks the question whether or not a reasonable person would have filed the involuntary petition under the same circumstances;

(4) the "subjective test" which is almost identical to the "improper purpose" test in that they both look to the subjective motivation of the petitioning creditor for the filing; and

(5) the "combined" or "two part" test which finds bad faith based upon consideration of both the subjective motivation and the objective reasonableness of the petitioning creditor(s).

*Landmark Distribs.,* 189 B.R. at 309–10 (footnotes and citations omitted). The Eighth Circuit has stated that the wrongful attempt to commence a bankruptcy proceeding under § 303(b)(1) constitutes bad faith. *Basin Elec. Power Coop. v. Midwest Processing Co.,* 769 F.2d 483, 486 (8th Cir.1985) (finding bad faith when creditor, with knowledge that debtor had more than 12 creditors, filed involuntary petition without meeting statutory requirement of three creditors joining in petition). Further evidence of bad faith occurs when a creditor uses a bankruptcy petition to affect a non-bankruptcy purpose. *Id.* at 487. These examples of bad faith from the Eighth Circuit would appear above in the "improper purpose" test.

■ The Court finds that the five tests overlap considerably while exploring different aspects of the same concept. *See also In re Whiteside,* 240 B.R. 762, 766 (Bankr.W.D.Mo.1999) (finding that the "improper purpose" label encompasses both the "improper purpose" test and the "improper use" test). In order to examine thoroughly whether Petitioners filed the involuntary petition in bad faith, the Court will consider whether the petition's allegations were well grounded in fact; whether Petitioners could have advanced their own interests in a different forum; whether Petitioners used the involuntary bankruptcy proceedings to obtain a disproportionate advantage over other creditors; whether the petition was motivated by an improper purpose, such as ill will, malice, or harassment; and whether a reasonable person would have initiated the petition under the same circumstances.

## B. APPLYING THE STANDARD

### 1. *Whether the petition's allegations were well grounded in fact*

■ Bennett testified that prior to filing the involuntary petition against Cannon, he did not contact other creditors or lenders to ascertain whether Cannon was paying its bills. Both Bennett and Kincaid testified that they did not investigate Cannon's history of paying its debts prior to filing the bankruptcy.

Kincaid testified that after meeting with Dean Cannon, Bennett, and Kevin Smith, he began to investigate the financial stability of Cannon. He said he "looked over the last few 10Qs" and decided it showed "a very definite trend that he was in trouble . . . ." Kincaid also testified that he and Bennett drove to Bell Trucking and saw that several trucks painted in Cannon colors were still on the lot. According to Kincaid, this indicated that Cannon was in financial trouble. He did not make any phone calls to any of Cannon's other creditors to see if they were being paid, and he gave no consideration to hiring someone to do a financial analysis of Cannon before filing the involuntary petition.

Pruss stated in his deposition that prior to his filing the involuntary petition, he did not talk with an attorney, participate in any discussions with the other petitioning creditors, attempt to collect the money allegedly owed to him by Cannon, or even know what an involuntary bankruptcy was.

Before a court enters an order for relief in an involuntary case, it must make a threshold inquiry whether the alleged debtor is paying its debts as they become due. Under § 303(h), the bankruptcy court shall order relief only if "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute." 11 U.S.C. § 303(h)(1). Likewise, this should be the threshold inquiry for creditors wishing to file an involuntary petition. Petitioners did not allege that Cannon was not paying its debts as they became due. In fact, Cannon introduced

evidence through its comptroller that 86.56% of Cannon's invoices are paid within 30 days—97.15% when weighted by dollar amount. Petitioners' expert, Don Davis, testified that before he would recommend one of his clients file an involuntary petition against a company, he would examine information such as whether non-crucial vendors were being paid. Petitioners did not undertake any prior investigation in this case.

2. *Whether Petitioners could have advanced their own interests in a different forum*

Bennett testified that Cannon owed him approximately $20,000.00 as a result of the alleged contracts between Cannon and Petitioners relating to the recruitment of foreign drivers, and $319,800.00 as a result of an agreement to pay to Petitioners $0.02/mile for each mile the foreign drivers drove during the first three years of their employment. He is not owed any money from Cannon relating to the Laredo freight terminal. Bennett also testified that, although he attempted to call Dean Cannon several times, he never filed a lawsuit against Cannon because he thought it would be futile.

Kincaid testified that Cannon owed him $84,460.21 as a result of the alleged Laredo freight contract, $24,600.00 as a result of the alleged foreign driver recruitment contract, and a total of $596,700.00. He also testified that after receiving Cannon's Form 10Qs and inspecting Bell Trucking, Petitioners decided that only way to get money out of Cannon was to file an involuntary petition against Cannon.

Pruss stated in his deposition that Cannon owed him about $370,000.00 for his role in bringing drivers over from Australia and New Zealand. Pruss's only motivation appears to have been to collect a debt.

■ It is apparent from the parties' testimony that the parties dispute the terms of the alleged contracts. Resolution of the contract dispute properly belongs in state court. *Bankers Trust Co. BT Serv. Co. v. Nordbrock (In re Nordbrock)*, 772 F.2d 397, 400 (8th Cir.1985) ("A creditor does not have a special need for bankruptcy relief if it can go to state court to collect a debt."). Using an involuntary petition for the purpose of collecting a debt is an improper use of the Court. The Court is not a substitute for customary collection procedures. *In re Goldsmith*, 30 B.R. 956, 963 (Bankr.E.D.N.Y.1983).

3. *Whether Petitioners used the involuntary bankruptcy proceedings to obtain a disproportionate advantage over other creditors*

Bennett testified that he thought that if he had a bankruptcy judgment, he'd be "right under the IRS along with the secured creditors," and would receive preferential status over other unsecured creditors. Bennett also testified that he used the bankruptcy petition in an attempt to receive preferential treatment over other unsecured creditors, thus attempting to obtain a disproportionate advantage for Petitioners.

■ There is no basis in bankruptcy law to support Bennett's theory of priority skipping. If the involuntary petition was appropriate, any claims Petitioners had against Cannon would be entitled to the priorities established under § 507. Filing a petition "to gain a strategic advantage, rather than to protect one's interest relative to other creditors or to prevent dissipation of assets, constitutes an improper purpose." *In re Silverman*, 230 B.R. 46, 53 (Bankr.D.N.J.1998).

4. *Whether the petition was motivated by an improper purpose, such as ill will, malice, or harassment*

Bennett said that he gave no consideration as to what effect the petition would

have on Cannon. According to Bennett, "my intention was to get my money." He said that he thought that after the petition was filed, Dean Cannon would "wake up and say, well, I did these boys wrong and I'll pay them." Bennett's motivation in filing the involuntary petition was "to get my money." He testified that he thought filing the petition would get Cannon to pay its alleged debt(s) to Petitioners.

Kincaid testified that after reviewing the Form 10Qs and inspecting Bell Trucking, Petitioners decided the only way to get any money out of Cannon was to file an involuntary bankruptcy petition. He also testified that after his April 2001 meeting with Dean Cannon, he knew that he was not going to be paid any money on at least one of the alleged contracts.

### 5. *Whether a reasonable person would have initiated the petition under the same circumstances*

Bennett said that after a meeting in April 2001 with Bennett, Kincaid, Kevin Smith, and Dean Cannon, he and Kincaid were angry and worried about receiving further payment from Cannon. The basis for his concern was that he was an unsecured creditor and believed Cannon was going into bankruptcy. Both Bennett and Kincaid testified that they did no investigation as to Cannon's history of paying its debts prior to filing the bankruptcy. Further, based on the evidence received at the hearing, the alleged money due Bennett and Kincaid are subject to dispute by Cannon.

Kincaid testified that after reviewing the Form 10Qs and inspecting Bell Trucking, Petitioners decided the only way to get any money out of Cannon was to file an involuntary bankruptcy petition. He gave no thought to hiring an expert to review the financial stability of Cannon, or to

calling any of Cannon's other creditors before filing the petition.

Pruss testified that he believed Cannon owed him $370,000.00 based on his involvement in recruiting foreign drivers to work for Cannon. This is the only reason given for his participation in the bankruptcy case. Prior to his filing the involuntary petition, Pruss did not talk with an attorney, participate in any discussions with the other petitioning creditors, attempt to collect the money allegedly owed to him by Cannon, or even know what an involuntary bankruptcy was.

The Court finds that a reasonable person would not have filed the involuntary petition without first investigating whether Cannon was generally paying its debts as they came due, or attempting to collect their alleged debt in the proper forum. Under these circumstances, a reasonable person would not have initiated an involuntary bankruptcy action. *In re Midwest Processing Co.,* 41 B.R. 90, 103 (Bankr. D.N.D.1984) (stating that the objective standard of bad faith examines "whether a reasonable person in the shoes of that petitioning creditor would have commenced the bankruptcy proceeding").

### C. CONCLUSIONS AS TO BAD FAITH

From the evidence presented at trial, the Court concludes that Petitioners' action in filing the involuntary petition was for a non-bankruptcy purpose. Petitioners failed to conduct adequate inquiry prior to filing the petition, and the alleged debt(s) are clearly subject to dispute. Although the evidence before the Court does not exhibit any ill will, malice, or harassment on the part of Pruss toward Cannon, the Court finds that Bennett and Kincaid filed the involuntary petition against Cannon in an attempt to harass Cannon into paying Petitioners. When the purpose for filing

an involuntary petition is a non-bankruptcy purpose, and when, as here, the filing was ill-advised, the Court must find bad faith. *Laclede Cab Co.*, 76 B.R. at 693. This Court finds that a preponderance of the evidence establishes that Petitioners filed the involuntary petition in bad faith.

## V. DAMAGES

This Court, having made a bad faith determination against Petitioners sufficient to award damages under § 303(i)(2), must now use its discretion in awarding those damages.

## A. COMPENSATORY DAMAGES

### 1. *CD early withdrawal penalty*

█ The Court received Plaintiff's Exhibits Nos. 17 and 18 at the hearing in February 2002. Plaintiff's Exhibit 17 consists of two letters from the Arkansas Workers' Compensation Commission [Commission] addressed to Mr. Duane Wormington, Cannon's comptroller; and a Certificate of Deposit Receipt from First National Bank of Springdale. Wormington testified that because Cannon is self-insured with the Commission, it is required to post a $400,000.00 Certificate of Deposit as collateral for claims that might occur and not be paid by Cannon. According to the first letter, dated May 25, 2001, the Commission cashed Cannon's Certificate of Deposit and placed the funds in an account controlled by the Commission when it received notice of Cannon's bankruptcy. The second letter is a cover letter with the Certificate of Deposit Receipt and a copy of the cashier's check attached. The cashier's check is in the amount of $385,769.86. According to the first letter from the Commission, there was a penalty for early withdrawal in the amount of $14,230.14. This penalty amount is reflected in the cashier's check that was forwarded to the Commission.

Petitioners put on no evidence or testimony to refute Cannon's claim for damages in the amount of $14,230.14 as a result of the cashed Certificate of Deposit. The Court finds that the penalty charged by First National Bank of Springdale is the direct result of Petitioners filing the involuntary petition, and Cannon is entitled to recover that amount from Petitioners, jointly and severally, as compensatory damages.

### 2. *Copy costs*

Plaintiff's Exhibit No. 18 consists of a statement on Nolan Law Firm letterhead reflecting 649 copies made by the Nolan Law Firm and Greg Almand, and a tally of copies made of the AP Distribution Journals reflecting 2484 additional copies. Wormington testified that the 649 copies were made at Cannon's offices by Mr. Barrett and Mr. Almand, counsel for Petitioners, and the 2484 copies were made by Cannon's employees at the request of Mr. Barrett and Mr. Almand.

Again, Petitioners put on no evidence or testimony to refute Cannon's claim for copy expenses. The Court finds that the copies were made as a direct result of Petitioners filing the involuntary petition. However, the record does not reflect any evidence or testimony presented by Cannon or Petitioners as to the cost of those copies. The Court will not speculate as to the cost of the copies, and, therefore, denies Cannon's claim for copies as compensatory damage.

### 3. *Lost sales*

#### a. *Testimony of the parties*

█ Both parties presented expert testimony regarding the alleged lost sales damages suffered by Cannon. Cannon relied on the analysis of damages by Dr. Leonard White, based on the data provid-

ed by Duane Wormington, and Petitioners relied on the analysis of damages by Don Davis. The Court found that White and Davis were both qualified experts for the purpose of their respective testimony. Dean Cannon also testified as to the damages suffered by Cannon.

White is a retired University of Arkansas professor of economics currently doing consulting work. He testified that he met with Dean Cannon and Wormington to discuss the alleged injury to Cannon caused by the involuntary petition. During that meeting, Wormington advised White that Cannon had been keeping a telephone log identifying Cannon's customers that had called expressing concern about the bankruptcy. White identified this as a "self-selecting" sample, and asked Wormington to sort the data into two sample groups—customers that did call and customers that did not call.

White examined the activity of the two groups for the months of May and June 2001. He testified that he chose those two months because the bankruptcy petition was filed late in May, making May the last clear month before the petition was filed and June the first month after the petition was filed. White testified that the group that called expressing concern experienced a drop in sales of $650,000.00 from May to June, which represented a 30% decrease. The group that did not call experienced a drop in sales of $49,000.00 or about 1% during the same period. Based on this research, White testified that it was his opinion that the drop in sales was caused by the involuntary petition.

White then testified as to the method he used to calculate Cannon's damages as a result of the involuntary petition. He testified that he followed the approach he uses in most damage cases by developing a low, medium, and high estimate of damages. He projected the loss through the

end of 2002, and stated that beyond that time may cause problems with his estimates, even though he thought the injury to Cannon would extend beyond that time. For his high estimate, White looked at the drop in sales from May 2001 to June 2001, and, based on this number, projected losses through December 2002 at $12,371,812.00. Because some of this amount would have had to go toward paying variable costs associated with making sales, White used a contribution profit rate of 30%, which represents the amount of lost sales that would have been used to cover fixed costs and generate profit. Applying this number to the predicted losses, White testified that the loss in sales that could have been used to cover fixed costs and generate profits was $3,711,543.00. White then used 6% as a nominal figure to try to adjust for inflation and future earnings. Upon doing this calculation, White testified that the total lost sales for the May to June period projected through December 2002 was $3,694,456.00, which represents his high estimate of damages to Cannon Express.

For his low estimate, White took into account any sales rebound that occurred between the date of filing and October 2001, and projected this amount through December 2002. This calculation represents a lower estimate of damages because it looks at the losses after the market has had time to adjust. White testified that the lost sales for this period would be $6,717,239.00. After performing the same contribution profit rate calculation used in the high estimate, White testified that the loss in sales that could have been used to cover fixed costs and generate profits was $2,015,175.00. White then adjusted this figure using the same 6% to adjust for inflation and future earnings as used in the first calculation. White testified that the total lost sales for the May to June period

projected through December 2002, taking into account any sales rebound post-petition, was $2,006,950.00, which represents his low estimate of damages.

Finally, for his medium estimate of damages, White used a log projection taking into account the sales for the five months before the bankruptcy was filed and the five months after the bankruptcy was filed. By projecting a constant rate of change, White was able to calculate predicted lost sales through the end of 2002. White testified that the predicted lost sales for this period using this method would be $9,251,210.00. After performing the same contribution profit rate calculation used in both the high and low estimates, White testified that the loss in sales that could have been used to cover fixed costs and generate profits was $2,775,363.00. White then adjusted this figure using the same 6% to adjust for inflation and future earnings as used in the earlier calculations. White testified that the total predicted lost sales for the May to June period projected through December 2002 was $2,768,288.00, which represents his medium estimate of damages to Cannon Express. White testified that it was his opinion that Cannon's damages were between the high and low estimate, most likely the middle figure.

Davis is a self employed Certified Public Accountant who performs consulting tax work and accounting services for his clients, 75% of whom are trucking companies. He testified that White's model to calculate damages is good, but he would have included at least the previous year to ensure no other factors affected the numbers.

Davis testified that he analyzed the sales and revenue trends for Cannon over the previous six quarters as reported in Can-

non's Form 10Qs and Form 10K to determine a trend in Cannon's revenue. Davis testified that the December 2000 and March 2001 Form 10Qs, which were prepetition, reflected a decrease in revenue of 3.9% and 7.4% [4] respectively; and that the September 2001 and December 2001 Form 10Qs, which were post-petition, reflected a decrease in revenue of 3.9% and 3.4% respectively. Based on this information, Davis testified that the decreases before and after the involuntary petition was filed reflect the same trend without any apparent additional loss post-petition. Davis also testified that in Cannon's Form 10Qs for the last six quarters, Cannon has given the same three reasons for the revenue decrease in the management discussion section of the Form 10Q: driver shortage, freight shortage, and a weaker economy. There was no mention of the involuntary bankruptcy proceeding or a projected loss.

Davis then testified as to his opinion on the solvency of Cannon based on the company's balance sheet included in its Form 10Qs. Davis explained that there was not enough information in the balance sheet alone to make a determination as to the solvency of Cannon. He testified that before he would recommend a client force a company into bankruptcy, he would need to examine more information, such as whether vendors were being timely paid. In analyzing vendor payments, Davis testified that he would go back six to nine months and see how long it was taking the company to pay its non-crucial vendors. Davis testified that vendors who sell fuel or telephone service are crucial and would always be paid promptly, but other vendors, such as repair, parts, or service vendors, are not as crucial, and

4. At another time during Davis's testimony, he testified that the decrease in revenue as reflected on the March 2001 Form 10Q was 4.2%. Based on the actual figures that Davis used to calculate his percentages, the Court finds that 7.4% is the correct percentage.

their payments would be pushed back if a transportation company is in trouble.

Dean Cannon testified that several news publications and trade journals knew about the petition, and this caused concern among his clients. In response to the publicity, Dean Cannon testified that he spent considerable time trying to calm the fears of several clients that were worried when they heard of the bankruptcy petition. Dean Cannon also testified that his company spent considerable time trying to assess the amount of damages it had incurred because of the involuntary bankruptcy petition.

Dean Cannon said that the actual Form 10Q reports were prepared by Duane Wormington, and that he typically received them after they were filed. When asked why the involuntary petition was not mentioned in the Form 10Q reports along with the economy, lack of freight, and shortage of drivers as a reason for the downturn in sales, Dean Cannon responded:

A. Well, we had enough trouble with the customers that Kincaid and whoever had notified expressing concern about our bankruptcy and I didn't feel like it would be beneficial to the company to go ahead and put it in a 10Q to advertise to those who didn't know that you had filed this petition.

Q. So you don't want your stockholders to know that . . .

A. No, I didn't say stockholders. I said customers. There is no material effect at this point so it would be kind of pointless to absolutely say—state facts in a 10Q.

b. *Findings by the Court*

The testimony that the Court received at trial is contradictory. White testified that Cannon's loss of use damage as a result of Petitioners filing an involuntary petition was approximately 2.7 million dollars. Davis did not proffer a figure to the Court indicative of his damage estimate, but did state that Cannon's revenue decreased at approximately the same rate before and after the filing without any apparent additional post-petition losses. Dean Cannon testified that, in his opinion, the bankruptcy filing has had "no material effect," and, because of that, has not been disclosed in any of the company's Form 10Qs.

The Court is not persuaded that the involuntary petition is the clear reason for Cannon's losses during the time period in issue. Cannon was already experiencing an economic downturn in its business according to the documents it was filing with the SEC.[5] Although Wormington and Dean Cannon testified that some of Cannon's customers had called with "concern," there was no evidence presented of what those concerns were. No customers were produced as witnesses at the hearing to substantiate that the reduction in their business with Cannon was because of their "concern" with the involuntary petition and not because of some other economic factor. A list of phone call records by customers who merely voiced "concerns" is not sufficient to find by a preponderance of the evidence that Cannon's loss of use damages as a result of the involuntary petition amounted to 2.7 million dollars.

---

5. *See* Plaintiff's Exhibit No. 20, Form 10Q for the quarter ended March 31, 2001; Defendant's Exhibit No. 7, Form 10Qs for the quarters ended December 31, 2000, March 31, 2001, September 30, 2001, and December 31, 2001; and Defendant's Exhibit No. 8, Form 10Q for the quarter ended September 30, 2000, and Form 10K for the year ended June 30, 2001.

Further, Dean Cannon's testimony and his course of conduct conflicts as to the reason for the company's downturn, and is not sufficiently convincing that the damages asserted by Cannon were the result of the involuntary petition. When asked why Cannon had not disclosed the bankruptcy on Cannon's quarterly Form 10Qs, Dean Cannon replied that it would be "pointless" to disclose facts in the 10Q that had no material effect on the company.

According to the standard instructions for filing forms under the Securities Exchange Act of 1934, which requires Form 10Q to be used for quarterly reports, each Form 10Q shall contain in Part II—Other Information, a section regarding "Legal Proceedings." The information required to be furnished to the SEC appears in the Code of Federal Regulations:

> Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is subject. Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought. Include similar information as to any such proceedings known to be contemplated by governmental authorities.

> Instructions to Item 103: 1. If the business ordinarily results in actions for negligence or other claims, no such action or claim need be described unless it departs from the normal kind of such actions.

> 2. No information need be given with respect to any proceeding that involves primarily a claim for damages if the amount involved, exclusive of interest and costs, does not exceed 10 percent of the current assets of the registrant and its subsidiaries on a consolidated basis. However, if any proceeding presents in large degree the same legal and factual issues as other proceedings pending or known to be contemplated, the amount involved in such other proceedings shall be included in computing such percentage.

> 3. *Notwithstanding Instructions 1 and 2, any material bankruptcy, receivership, or similar proceeding with respect to the registrant or any of its significant subsidiaries shall be described.*

17 C.F.R. § 229.103 (emphasis added).

In its Form 10Q for the pre-petition quarters ending September 30, 2000, and March 31, 2001, under Note C—Legal Proceedings, Cannon disclosed a decision rendered against Cannon by the EEOC. Cannon stated in its reports that it had accrued $250,000.00 for potential penalties and associated legal fees related to that decision. It also stated that it did not believe that settlement of the charge would have a material adverse effect on profitability or financial position of the company. It is inconsistent to disclose a potential penalty in the amount of $250,000.00, and not later disclose an involuntary bankruptcy petition that caused an alleged $2,500,000.00 in damages to the company. Unless, in fact, the bankruptcy has had no material effect on the company, as Dean Cannon testified.

The Court cannot find that Cannon met its burden of proving by a preponderance of the evidence that its loss of use damages in the amount of $2,768,288.00 were proximately caused by the filing of the involuntary petition. While the Court is convinced that Cannon was damaged by the filing of the involuntary petition, it cannot apportion a percentage of loss or make a deduction from White's analysis based on the record evidence. It would not be fair

to Petitioners to attempt to assess or apportion actual damages for lost sales that may have been caused by several factors. Therefore, the Court denies Cannon's claim in the amount of $2,768,288.00 for lost use damages.

## B. PUNITIVE DAMAGES

11 U.S.C. § 303(i)(2) provides for a discretionary punitive damages award. Punitive damages can be awarded when there is a showing that the petitioning creditors filed the involuntary petition without just cause or excuse, and to punish the wrongdoers and deter similar conduct in the future. *Laclede Cab Co.,* 76 B.R. at 694. In this case, the abuse of the bankruptcy system was so blatant and extreme that the Court finds that an award of punitive damages will serve both objectives. In assessing an award of punitive damages, the court in *K.P. Enterprise* stated,

> [t]he purposes for assessing punitive damages are to punish the wrongdoer, to deter him from repeating his misdeeds, and to set an example so that others will be dissuaded from engaging in such conduct. (citations omitted). Under § 303(i), the inquiry invokes a federal standard, requiring the court to exercise its discretion in a manner that will discourage misuse of the bankruptcy process, without discouraging resort to it in appropriate circumstances. (citation and footnote omitted). If punitive damages are called for, the award must be carefully tailored in light of other damages and fees awarded in the case, so that the result implements bankruptcy policy, but is not "unduly harsh." (citation omitted).

*In re K.P. Enters.,* 135 B.R. 174, 183–84 (Bankr.D.Me.1992).

The conduct of Bennett and Kincaid failed each of the numerated tests for a finding of good faith on the part of a petitioning creditor. The Court finds that the punishment and deterrence policies of § 303(i) would be served by an award of punitive damages. As applied to the facts of this case, the Court finds that the amount of punitive damages that is appropriate, not unduly oppressive in the light of the conduct of Bennett and Kincaid, and consistent with the severity of the improper action is $15,000.00 each.

The conduct of Pruss also failed each of the numerated tests for a finding of good faith on the part of a petitioning creditor, but did not exhibit the ill will, malice, or harassment present in Bennett's and Kincaid's actions. Again, the Court finds that the punishment and deterrence policies of § 303(i) would be served by an award of punitive damages. As applied to the facts of this case, the Court finds that the amount of punitive damages that is appropriate, not unduly oppressive in the light of the conduct of Pruss, and consistent with the severity of the improper action is $5000.00.

The Court will enter its order consistent with the above findings: Cannon is allowed compensatory damages from Petitioners, jointly and severally, in the amount of $14,230.14, and is awarded punitive damages in the amount of $15,000.00 from Bennett, $15,000.00 from Kincaid, and $5000.00 from Pruss.

IT IS SO ORDERED.